**UNITED STATES of America, Appellee,**

v.

**Louis Kenneth RISKEN, Appellant.**

**No. 84–2449.**

United States Court of Appeals, Eighth Circuit.

Submitted April 10, 1985.

Remanded Dec. 17, 1985.

Resubmitted Feb. 14, 1986.

Decided April 18, 1986.

Rehearing and Rehearing En Banc Denied May 22, 1986.

---

Philip Miller, Des Moines, Iowa, for appellant.

Beneva Weintraub, Washington, D.C., Guy Cook, Asst. U.S. Atty., Des Moines, Iowa, for appellee.

Before LAY, Chief Judge, McMILLIAN, Circuit Judge, and WOODS,* District Judge.

McMILLIAN, Circuit Judge.

Louis Kenneth Risken appeals from a final judgment entered in the District Court[1] for the Southern District of Iowa upon a jury verdict finding him guilty of two counts of obstruction of justice in violation of 18 U.S.C. § 1503 and two counts of witness tampering in violation of 18 U.S.C. § 1512(a)(1), (2)(A). The district court sentenced appellant to a total of twenty years imprisonment with the provision that appellant would be immediately eligible for parole under 18 U.S.C. § 4205(b)(2).

For reversal appellant argues that (1) the district court erred in denying his motion to dismiss the obstruction of justice counts, counts 1 and 4; (2) Bennett was not a "witness" within the meaning of 18 U.S.C. §§ 1503, 1512; (3) tape recordings were admitted without foundation evidence; (4) prosecutorial threats intimidated a government witness; (5) there was insufficient evidence to support the jury verdict on counts 2 and 4; (6) the district court abused its discretion in denying several defense motions; (7) the district court erred in refusing to give certain instructions to the jury; and (8) the government failed to disclose a substantial, contingent payment to its chief witness.

For the reasons discussed below, we affirm the judgment of the district court.

FACTS

In February 1984 a federal grand jury in the Southern District of Iowa was investigating possible criminal violations of federal labor laws, including kickbacks, unlawful investments or loans, and the improper administration of the union health and welfare plan. The target of the grand jury investigation was Teamsters Local 147 and its president Vernon N. Bennett. Appellant owns the International Insurance Agency. Appellant was subpoenaed to testify before the grand jury on February 23, 1984, and March 21, 1984. The grand jury asked appellant questions about his selling insurance to Teamsters Local 147, his relationship with Bennett and his role in the administration of the union health and welfare plan.

Bennett was also subpoenaed to testify before the grand jury on March 21, 1984. Bennett appeared before the grand jury

---

* The Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas, sitting by designation.

1. The Honorable Harold D. Vietor, Chief Judge, United States District Court for the Southern District of Iowa.

and, upon the advice of his attorney, asserted the fifth amendment privilege against self-incrimination.

On May 15, 1984, Randall Cason and Thaddius Greenfield drove to appellant's office. Cason wanted to borrow $50 from appellant. When they arrived at the office, only Cason went inside the building. A short time later Cason and appellant left the building and got inside appellant's car. According to the government's evidence, appellant asked Cason if Cason could find someone who would perform a "contract" killing. Appellant told Cason that a "union man" was currently "involved" in a federal grand jury and that appellant was afraid that the "union man" could "cause him a problem." Appellant told Cason that if Cason knew of anyone who would perform the contract, Cason should have that individual call appellant using the name "Joe White."

Cason rejoined Greenfield and told him what appellant had said. Unknown to Cason, Greenfield occasionally worked as an informant for the FBI. Greenfield told Cason that he might be able to help appellant with the contract killing.

The next day Greenfield told FBI special agent William Barrett Root about appellant's conversation with Cason. Agent Root advised Greenfield to see if he could determine the identity of the "union man" and then to report back.

On May 18, 1984, at Greenfield's request, Cason called appellant to let him know that someone would be calling him. Posing as Joe White, Greenfield then called appellant and they arranged to meet at a local discount department store that evening. Greenfield unsuccessfully attempted to contact Agent Root to inform him about the arranged meeting. Later Greenfield and Cason drove to the discount department store. Greenfield parked his car some distance from the store and Cason stayed inside the car. Greenfield walked to the front of the store and met appellant there as arranged. Appellant offered Greenfield $2,000 to kill a man whom appellant identified only as a "big shot" in the

Teamsters who could hurt him in a federal grand jury hearing. Greenfield told appellant that he had come from St. Louis and requested money for expenses. Appellant gave Greenfield $30 and they arranged to meet again the next morning at appellant's office.

On May 19, before meeting appellant as arranged, Greenfield borrowed a small tape recorder in order to record the meeting. Greenfield then went to appellant's office. Greenfield and appellant discussed the "contract" in appellant's car. Greenfield had concealed the tape recorder in his pocket and switched on the tape recorder as he entered the car. Appellant gave Greenfield an additional $50 for expenses and then told Greenfield that the person to be killed was at that time out of town, but would be returning to attend a niece's high school graduation, and was generally "available" during the morning from 7:00 to 8:30 a.m. Appellant also asked Greenfield if he had a silencer. Greenfield answered that he did and appellant responded that that would be necessary. Appellant also assured Greenfield that his intentions were serious and "for real."

On May 21, 1984, Greenfield informed Agent Root of these developments. On May 23, 1984, Greenfield called appellant's office from the local FBI office. The call was recorded by the FBI. Appellant agreed to meet Greenfield the next morning. On May 24, 1984, Greenfield, wearing a concealed recording device, met appellant as arranged. During this conversation appellant denied discussing a contract, asking about a silencer or offering Greenfield $2,000 to kill someone. Appellant instead described their prior conversations as involving a car wash and stated that he could not raise the money to invest in the car wash. Greenfield then asked appellant why he had agreed to meet him in the first place and appellant answered that he had done so out of curiosity.

On May 25, 1984, Agent Root advised Bennett about appellant's recent conduct. Bennett informed Agent Root that he had been out of town during the past week and

had returned in order to attend his niece's high school graduation. Bennett also recognized and identified one of the voices on the tape recordings as that of appellant.

Bennett's wife, Dixie Lee Bennett, worked for appellant in his insurance business. On May 25, 1984, Bennett called his wife at work and told her that someone had threatened his life but did not identify appellant. Mrs. Bennett left the office and met her husband at his attorney's office. When she returned to work, appellant asked her where she had been. Mrs. Bennett told appellant that someone had threatened her husband and that she had been at his attorney's office. About an hour later Bennett's attorney called Mrs. Bennett at work and advised her to go home. As she was leaving, appellant asked her where she was going. Mrs. Bennett told appellant that she had been advised to go home and then left.

Shortly after Mrs. Bennett left appellant's office, appellant made a call from a pay telephone booth at a neighboring gasoline station. The gasoline station attendant overheard some of the conversation and heard appellant say "the feds are on the case now," "I tell you they are on the case," "he's being interviewed right now," and "I tell you, my source says he is being interviewed right now." After appellant hung up, the attendant called the FBI.

On May 30, 1984, Randall Cason was subpoenaed to testify before the grand jury. Cason contacted appellant and asked

him why he had been subpoenaed. Appellant asked Cason what he was going to say when he appeared before the grand jury. Cason indicated that all he could do was say what appellant had told him. Appellant then told Cason that "it was all a joke" and a "scam" and that he had only gone along with the plan to see how far it would go. Appellant also told Cason that if he would do him a favor, appellant would do a favor for him.

On June 26, 1984, appellant was indicted by the federal grand jury and charged with two counts of obstruction of justice in violation of 18 U.S.C. § 1503 by endeavoring to hire someone to kill Bennett (count 1) and making false and misleading statements to Randall Cason (count 4) and two counts of witness tampering by engaging in misleading conduct toward Randall Cason (count 2) in violation of 18 U.S.C. § 1512(a)(1) and attempting to hire someone to kill Bennett (count 3) in violation of 18 U.S.C. § 1512(a)(2)(A). Following a five-day trial, the jury found appellant guilty of all four counts on October 5, 1984. Post-trial motions were denied. On November 2, 1984, the district court sentenced appellant to a total of twenty years imprisonment.[2] This appeal followed.

## OBSTRUCTION OF JUSTICE AND WITNESS TAMPERING

Appellant first argues that he was improperly charged in counts 1 and 4 with obstruction of justice in violation of 18 U.S.C. § 1503.[3] Appellant argues that be-

---

2. The district court sentenced appellant to five years for count 1, ten years for count 2, to be served consecutively to the sentences for counts 1 and 3, ten years for count 3, to be served concurrently to the sentence for count 1, and five years for count 4, to be served concurrently to the sentence for count 2 and consecutively to the sentences for counts 1 and 3.

3. 18 U.S.C. § 1503, as amended by the Victim and Witness Protection Act, Pub.L. No. 97–291, 96 Stat. 1248 (1982), provides:

§ 1503. Influencing or injuring officer or juror generally

Whoever corruptly, or by threats or force, or by any theatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who

may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than than five years, or both.

cause the Victim and Witness Protection Act (VWPA), Pub.L. No. 97–291, 96 Stat. 1248 (1982), expressly deleted all references to witnesses from former § 1503 [4] and enacted provisions such as § 1512 [5] that specifically provide increased protection to

4. Former 18 U.S.C. § 1503 provided:

§ 1503. **Influencing or injuring officer, juror or witness generally**

Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

5. § 1512. **Tampering with a witness, victim, or an informant**

(a) Whoever knowingly uses intimidation or physical force, or threatens another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

(1) influence the testimony of any person in an official proceeding;

(2) cause or induce any person to—

(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

(B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

(C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

(D) be absent from an official proceeding to which such person has been summoned by legal process; or

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;

shall be fined not more than $250,000 or imprisoned not more than ten years, or both.

(b) Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from—

(1) attending or testifying in an official proceeding;

(2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;

(3) arresting or seeking the arrest of another person in connection with a Federal offense; or

(4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding;

or attempts to do so, shall be fined not more than $25,000 or imprisoned not more than one year, or both.

(c) In a prosecution for an offense under this section, it is an affirmative defense, as to which the defendant has the burden of proof by a preponderance of the evidence, that the conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully.

(d) For the purposes of this section—

(1) an official proceeding need not be pending or about to be instituted at the time of the offense; and

(2) the testimony, or the record, document, or other object need not be admissible in evidence or free of a claim of privilege.

(e) In a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance—

(1) that the official proceeding before a judge, court, magistrate, grand jury, or government agency is before a judge or court of the United States, a United States magistrate, a bankruptcy judge, a Federal grand jury, or a Federal Government agency; or

(2) that the judge is a judge of the United States or that the law enforcement officer is an officer or employee of the Federal Government or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant.

(f) There is extraterritorial Federal jurisdiction over an offense under this section.

witnesses, § 1503 as amended no longer applies to witnesses. Alternatively, appellant argues that Bennett was not a "witness" within the meaning of either § 1503 or § 1512 because Bennett had already appeared before the grand jury and refused to testify and was unlikely to be recalled by the grand jury at the time appellant attempted to hire Greenfield to kill him.

Appellant has preserved this argument for appellate review. This argument was raised during trial in the district court and the government responded to defense motions by arguing that appellant had been properly charged under both § 1503 and § 1512.

We reject appellant's argument about the relative scope of § 1503 as amended and § 1512. Similar arguments have been rejected by other circuit courts of appeal. *See United States v. Rovetuso*, 768 F.2d 809, 823–24 (7th Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 838, 88 L.Ed.2d 809 (1986); *United States v. Lester*, 749 F.2d 1288, 1291–96 (9th Cir.1984); *United States v. Wesley*, 748 F.2d 962, 963–65 (5th Cir. 1984), *cert. denied*, — U.S. —, 105 S.Ct. 2664, 86 L.Ed.2d 281 (1985); *United States v. Beatty*, 587 F.Supp. 1325, 1329–33 (E.D. N.Y.1984); *see generally* S.Rep. No. 532, 97th Cong., 2d Sess. 15–16 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 2515, 2520–22; Jeffress, *The New Federal Witness Tampering Statute*, 22 Am.Crim. L.Rev. 1 (1984). *But cf. United States v. King*, 762 F.2d 232, 236–38 (2d Cir.1985) (nonmisleading, nonthreatening, nonintimidating attempt to have person give false information to government held not within scope of § 1512; not within § 1503 because there was no pending judicial proceeding at time defendant sought to have witness give false information), *cert. denied*, — U.S. —, 106 S.Ct. 1203, 89 L.Ed.2d 316 (1986); *United States v. Hernandez*, 730 F.2d 895, 897–99 (2d Cir.1984) (holding that by enacting VWPA Congress intended intimidation and harassment of witnesses to be prosecuted under § 1512, not § 1503).

As explained in *United States v. Wesley*, 748 F.2d at 963–64 (footnotes omitted),

[b]efore 1982, 18 U.S.C. § 1503 was entitled "Influencing or injuring officer, juror or witness generally," and it prohibited influencing or intimidating, "any witness ..., grand or petit juror, or [court] officer" in the discharge of his [or her] duty. The section also contained a residual [or omnibus] clause prohibiting anyone from obstructing or attempting to obstruct the "due administration of justice." In 1982 [in the VWPA], Congress amended § 1503, and removed all references to witnesses. At the same time, [Congress] also enacted 18 U.S.C. § 1512 which focuses solely on the protection of witnesses, informants and crime victims from intimidation. The safeguards afforded by § 1512 are both more extensive and more detailed than those given by § 1503. Congress did not, however, remove the residual [or omnibus] clause of § 1503 in its 1982 [VWPA] amendments.

"The newly enacted section, § 1512, was intended to provide greater protection for witnesses than did § 1503. The new section protects witnesses against being influenced by intimidation and harassment [and misleading conduct] in addition to corruption, threats, or force to which § 1503 was limited." *United States v. Beatty*, 587 F.Supp. at 1331. As further noted in *United States v. Lester*, 749 F.2d at 1292–93 (citations omitted),

Congress may well have intended to remove the protection of witnesses from section 1503. It by no means follows, however, that Congress intended to reduce the effectiveness of section 1503 in combating "miscarriage[s] of Justice by corrupt methods." Yet this is precisely the result to which [appellant's] urged construction would lead. If witness tampering should fall exclusively under section 1512, and if the accused used a method other than one prescribed in section 1512 (intimidation, physical force, threats, harassment, or misleading conduct), that conduct would no longer be prohibited. Neither section 1503 nor section 1512 would cover it.

■ We agree and hold that witness tampering is punishable under § 1503. However, the two statutes are not coextensive. For example, § 1512 is not restricted to witnesses but protects "any person" involved in an official proceeding. By comparison, § 1503 protects only "witnesses," as well as grand and petit jurors and court officers, although witness status has been expansively construed and applied. *See, e.g., United States v. Chandler*, 604 F.2d 972, 974 (5th Cir.1979) (rejecting limitation of "witness" for purposes of § 1503 to only while case is pending in trial court), *cert. dismissed*, 444 U.S. 1104, 100 S.Ct. 1074, 63 L.Ed.2d 317 (1980); *United States v. Jackson*, 168 U.S.App.D.C. 198, 513 F.2d 456, 460 (1975) (fact that witness was discharged is immaterial to witness status for purposes of § 1503). In addition, § 1512 is expressly not limited to "pending" official proceedings, 18 U.S.C. § 1512(d)(1), or by considerations of admissibility, *id.* § 1512(d)(2), and thus "explicitly covers 'potential' witnesses and those witnesses whose testimony might not be admissible at trial." *United States v. Hernandez*, 730 F.2d at 898. By comparison, "[a] prerequisite to any violation of section 1503 is the existence of a pending judicial proceeding known to the violator. A grand jury investigation is such a proceeding." *United States v. Vesich*, 724 F.2d 451, 454 (5th Cir.1984) (citations omitted).

Moreover, § 1512 prohibits only specific types of conduct—intimidation, physical force, threats, or attempts to do so, misleading conduct, or harassment. 18 U.S.C. § 1512(a),(b); *e.g., United States v. King*, 762 F.2d at 238; *United States v. Lester*, 749 F.2d at 1293. In particular, § 1512 prohibits intimidation and harassment, thus "establishing a lower threshold of criminal activity [than § 1503]." *United States v. Hernandez*, 730 F.2d at 898; *see* S.Rep. No. 532 at 15, *reprinted in* 1982 U.S.Code Cong. & Ad.News at 2521 (expanded scope of prohibited conduct to include verbal harassment). As noted in *United States v. Lester*, 749 F.2d at 1293–94 (citations and footnote omitted),

[t]he omnibus clause of section 1503, by contrast, is broader. It reaches conduct that "corruptly ... endeavors to influence, obstruct, or impede, the due administration of justice." In decisions prior to the enactment of section 1512, ... the argument that the omnibus provision covers only activities obstructing justice that involve force, threats, or intimidation [was consistently rejected]. [Section 1503] includes noncoercive witness tampering.

*Cf. United States v. King*, 762 F.2d at 238 (§ 1512 does not apply to nonmisleading, nonthreatening, nonintimidating attempt to have person give false information to the government, but may violate § 1503 if there was a pending judicial proceeding at the time); *United States v. Vesich*, 724 F.2d at 454 (noncoercive witness tampering falls precisely within § 1503 when witness prevented from testifying in federal prosecution).

The difference between the scope of § 1512 and § 1503 is illustrated in *United States v. King*, 762 F.2d at 236. In *King* the defendant was charged and convicted of knowingly engaging in misleading conduct toward another person by making false statements in order to hinder and prevent the disclosure to law enforcement agents of the defendant's participation in counterfeiting. The jury found the defendant guilty of violating § 1512 and several other counts, but the district court vacated the verdict on the ground that the facts proven did not amount to a violation of § 1512. The government cross-appealed. The court of appeals affirmed because

the evidence did not indicate that [the defendant] had misled [the witness] in any way. Rather, "[the defendant], simply and flat-out, tried to persuade [the witness] to lie" to mislead the government....

... [S]ince the evidence failed totally to support any inference that [the witness] was, or even could have been, misled, the conduct proven by the government was not within the terms of § 1512.

*Id.* at 237 (other citations omitted), *citing United States v. King,* 597 F.Supp. 1228, 1231 (W.D.N.Y.1984). The court of appeals noted that prosecution under § 1503 was not possible "because there was no pending judicial proceeding at the time [the defendant] sought to have [the witness] give false information." 762 F.2d at 238. *Cf. United States v. Lester,* 749 F.2d at 1295–96 (noncoercive and nonmisleading witness tampering during pending judicial proceeding punishable under § 1503, but not § 1512). *But cf. United States v. Wesley,* 748 F.2d at 964 (holding that "urging and advising" a witness to testify falsely is prohibited by § 1512 and § 1503; unclear from published opinion whether there was intimidation or misleading conduct or whether there was a pending judicial proceeding at the time); *United States v. Hernandez,* 730 F.2d at 897–99 (holding that threatening a potential witness violates only § 1512; unclear whether there was a pending judicial proceeding at the time).

Here, the government proved that appellant attempted to hire Greenfield to kill Bennett, a grand jury witness, and that appellant engaged in misleading conduct toward another grand jury witness, Cason. Both types of conduct fall within the terms of § 1512 and § 1503. The government also proved that there was a pending grand jury proceeding known to appellant and that appellant acted with the intent to obstruct the administration of justice.

■ We also hold that appellant's conviction under both § 1512 and § 1503 is not multiplicious in violation of the double jeopardy clause of the fifth amendment. *See United States v. Wesley,* 748 F.2d at 963–65. Proof of a violation of § 1503 requires proof of the defendant's knowledge of a pending judicial proceeding, which is expressly not an element of a violation of § 1512.

■ Appellant alternatively argues that Bennett was not a "witness" within the meaning of 18 U.S.C. § 1503 or 18 U.S.C. § 1512 because Bennett had already appeared before the grand jury and refused to testify and was unlikely to be recalled by

the grand jury at the time appellant attempted to hire Greenfield to kill him. As discussed above, witness status is expressly not required under § 1512, which specifically refers to "persons" and not "witnesses."

■. With respect to Bennett's status as a witness for purposes of § 1503, appellant's proposed definition of "witness" is too narrow. In *Odom v. United States,* 116 F.2d 996, 998 (5th Cir.), *rev'd on other grounds,* 313 U.S. 544, 61 S.Ct. 597, 85 L.Ed. 1511 (1941), the court held that a person was considered a witness "[i]f he [or she] knows or is supposed to know material facts, and is expected to testify to them, or be called on to testify." A person's status as a witness continues even when judicial proceedings have already occurred as long as there is a possibility that the person would testify or be called upon to testify in the future. For example, in *United States v. Chandler,* 604 F.2d at 975, the court applied a "pragmatic definition of a section 1503 'witness' in light of the protective purpose of the obstruction of justice statute" and held that a person who had testified at trial remains a witness for purposes of § 1503 while the direct appeal is pending. Here, the grand jury had not concluded its investigation at the time appellant engaged in conduct prohibited by § 1503. Even though Bennett had asserted the fifth amendment privilege, he knew or was supposed to know material facts about the matters under investigation by the grand jury and could have been recalled to appear before the grand jury. Under these circumstances, we hold Bennett was a witness for purposes of § 1503.

## ADMISSIBILITY OF TAPE RECORDINGS

■ Appellant next argues that the district court abused its discretion in admitting the May 19 and May 24 tape recordings into evidence because the government failed to meet the foundational requirements for introducing tape recordings. As discussed above, Greenfield made the May 19 tape recording using a friend's tape

recorder and without FBI assistance. The FBI made the May 24 tape recording using a body recording device worn by Greenfield. Appellant argues that the government did not establish the capability of the equipment, the competency of the operator (Greenfield) or the accuracy of the tape recording with respect to the May 19 tape recording. *See, e.g., United States v. McMillan,* 508 F.2d 101, 104 (8th Cir.1974), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975). Appellant specifically argues that there were at least eight gaps in the May 19 tape recording and several unidentified speakers, Greenfield was not competent to operate the tape recorder, and there was no proof that the tape recording had not been tampered with.

These arguments are without merit. "The very fact that the tape recording[ ] exist[s] establishes that the recording device was capable of picking up sounds and taking the conversation offered." *United States v. McCowan,* 706 F.2d 863, 865 (8th Cir.1983) (per curiam), *citing United States v. Moss,* 591 F.2d 428, 433 (8th Cir.1979). In addition, Greenfield testified that he learned how to use the tape recorder on the day he made the May 19 tape recording. "This fact, and the fact that [Greenfield] successfully made the tape recording[ ], satisfied the competency requirement of the ... *McMillan* test." *United States v. McCowan,* 706 F.2d at 865. Greenfield also identified the tape recording as an accurate record of his May 19 conversation with appellant. The government expert testified that he had examined the May 19 tape recording and that in his opinion the tape recording was authentic, original and continuous except for eight brief erasures, which the expert believed were apparently caused after recording by rewinding and playing back the tape recording. The government expert also tentatively identified the unidentified speakers as background noise. Under these circumstances, the government adequately met the foundational requirements for introducing the May 19 tape recording into evidence.

Appellant also argues that the May 24 tape recording was not voluntarily made because Greenfield improperly induced him to talk. The evidence presented by the government, however, indicated that appellant voluntarily entered into the conversation with Greenfield.

We conclude the district court did not abuse its discretion in admitting the tape recordings into evidence.

## PROSECUTORIAL INTIMIDATION OF CASON

■ Appellant next argues that he was unable to effectively cross-examine Cason, a key government witness, because Cason had been so intimidated by the prosecutor that he was unable to testify truthfully without fear of governmental reprisal. Appellant argues that before Cason appeared before the grand jury and again before trial, the prosecutor intimidated Cason by threatening to prosecute him for perjury. Appellant argues that this prosecutorial misconduct violated due process and deprived him of his sixth amendment right to present witnesses in his own defense.

The government argues that appellant's characterization of the prosecutor's statements as "prosecutorial misconduct" is unwarranted. The government admits the prosecutor advised Cason about the dangers and consequences of committing perjury. The government argues, however, that such statements were informative and merely cautionary and not intimidating, coercive or threatening. The government further argues that any error was harmless because the prosecutor's "advice" did not in fact prevent Cason from testifying and being cross-examined at appellant's trial.

"It is not improper *per se* for a ... prosecuting attorney to advise prospective witnesses of the penalties for testifying falsely. But warnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify." *United States v. Blackwell,* 224 U.S.App. D.C. 350, 694 F.2d 1325, 1334 (1982) (citations omitted). The prosecutor's statements in the present case do not approxi-

mate the sort of governmental misconduct held unconstitutional in the leading case of *Webb v. Texas,* 409 U.S. 95, 98, 93 S.Ct. 351, 353, 34 L.Ed.2d 330 (1972) (per curiam), in which the trial court gratuitously and at great length admonished only the defendant's single witness not to lie and warned him of the dire consequences of perjury, or in *United States v. Smith,* 156 U.S.App.D.C. 66, 478 F.2d 976, 979 (1973), in which the prosecutor threatened to prosecute the prospective witness for *past* crimes if he took the stand and testified in a pending trial. Rather, the prosecutor's statements in the present case constituted a constitutionally permissible "mere warning" about the dangers of committing perjury. *See, e.g., United States v. Blackwell,* 694 F.2d at 1335; *United States v. Simmons,* 216 U.S.App.D.C. 207, 670 F.2d 365, 371 (1982) (per curiam); *cf. United States v. Harlin,* 539 F.2d 679, 681 (9th Cir.) (trial judge's warning), *cert. denied,* 429 U.S. 942, 97 S.Ct. 362, 50 L.Ed.2d 313 (1976). The prosecutor told Cason about the serious consequences of perjury, including the possibility of prosecution and the range of punishment. The prosecutor's remarks here were limited to warning Cason about the serious consequences of perjury in the context of Cason's testimony in this case; the prosecutor did not threaten to prosecute Cason for other crimes or to retaliate against him if he testified truthfully. *See United States v. Blackwell,* 694 F.2d at 1334 (citing cases involving threats of prosecution for other crimes, reindictment on dropped charges, revocation of probation).

■ We note, however, that prosecuting attorneys should exercise considerable restraint when advising potential witnesses about the consequences of committing perjury.

## SUFFICIENCY OF THE EVIDENCE OF MISLEADING CONDUCT

■ Appellant next argues that there was insufficient evidence that he engaged in misleading conduct by telling Cason that the plan to kill Bennett was a joke and a scam. Appellant argues that he did not engage in misleading conduct toward Cason because he actually believed that the conversations with Greenfield and the plan to kill Bennett were only a joke and a scam and that he was only attempting to influence Cason to tell what he believed to be the truth. However, in finding appellant guilty of obstruction of justice by attempting to hire Greenfield to kill Bennett, the jury implicitly found that appellant intended to hire Greenfield to kill Bennett and that the plan was not a joke. Thus, by telling Cason that the plan was only a joke, appellant engaged in misleading conduct toward Cason. *Cf. United States v. O'Keefe,* 722 F.2d 1175, 1181 (5th Cir.1983) (obstruction of justice in violation of 18 U.S.C. § 1503).

## TRIAL ERRORS

Appellant next argues that the district court abused its discretion in denying several defense motions. In particular, appellant argues that the district court abused its discretion in denying his motions for continuances, motions to dismiss for failure to produce exculpatory evidence, and motions for mistrial for prosecutorial misconduct. We have carefully reviewed appellant's allegations and find no abuse of discretion.

## INSTRUCTIONS

■ Appellant next argues that the district court erred in refusing to give certain instructions to the jury. Appellant argues that the district court improperly refused to give the "usual" witness credibility instruction and gave inadequate instructions on reasonable doubt, the burden of proof and the presumption of innocence. We have carefully reviewed as a whole the instructions given by the district court and find no error in the instructions as given. The district court did instruct the jury about witness credibility. This instruction is somewhat cursory but adequate. The reasonable doubt instruction given by the district court is taken from 8th Cir. Model Criminal Jury Instructions § 3.11 (1985). The district court did not give separate instructions about the burden of proof or

presumption of innocence but expressly stated and repeatedly referred to both principles in other instructions.

## NONDISCLOSURE OF PAYMENT TO GOVERNMENT WITNESS

Before trial the district court ruled that government records of any payments made to Greenfield were exculpatory evidence and ordered the government to produce any such records. The government disclosed before trial and presented evidence during trial that the FBI had paid Greenfield $500 in connection with his work in the present case and $250 in connection with an earlier drug investigation. Under cross-examination Greenfield and FBI special agent Root denied that Greenfield had been promised any additional substantial payment for his investigative work in the present case. Agent Root testified, however, that the FBI paid "on results." At the sentencing hearing on November 2, 1984, defense counsel informed the district court that he had heard that Greenfield would be paid an additional $5,000 and that Greenfield had told others that he planned to go to Hawaii. To this information the prosecuting attorney responded: "I don't know what the basis of [defense counsel's] information is. I don't know the internal workings of the FBI. I am not aware of any trips to Hawaii, or secret agreements, or anything of that nature, that [defense counsel] has urged." The district court denied appellant's motion for disclosure but directed the government to preserve its payment records so that they would be available for examination if necessary. On December 10, 1984, the prosecuting attorney informed the district court and defense counsel by letter that after the trial the FBI had authorized and paid Greenfield $5,000.

Appellant argues that evidence of a potential financial reward which gave Greenfield, the government's chief witness, a direct and personal stake in appellant's conviction could have been used to impeach Greenfield by showing bias or interest and that its suppression denied him due process

of law. *See United States v. Bagley,* —— U.S. ——, 105 S.Ct. 3375, 3380–81, 87 L.Ed.2d 481 (1985); *United States v. Agurs,* 427 U.S. 97, 104–12, 96 S.Ct. 2392, 2397–2401, 49 L.Ed.2d 342 (1976); *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). Appellant argues that the government's nondisclosure misleadingly induced defense counsel, and ultimately the jury, to believe that Greenfield had received only $500 for his investigative work in the present case. Appellant also argues that Greenfield's testimony should be stricken because the $5,000 payment was in the nature of a reward or "bounty" made contingent upon appellant's conviction, citing *Williamson v. United States,* 311 F.2d 441 (5th Cir.1962).

The government argues that the nondisclosure claim should not be considered on appeal because it was not raised in the district court. The government argues that appellant should dismiss the present appeal and file a motion for new trial on the basis of newly discovered evidence in the district court. Brief for Appellee at 51 n. 11. On the merits the government argues that information about the $5,000 payment was not "suppressed" because the payment was not authorized until after trial and was not paid to Greenfield until after sentencing and, once payment was made, that fact was promptly disclosed to the district court and defense counsel. The government further argues that defense counsel's characterization of the $5,000 payment as a reward contingent upon appellant's conviction is speculative and unsupported by the record.

Because the controversy about the $5,000 payment arose during sentencing and actual payment was not made until two months after trial, we could not rule upon the merits of appellant's nondisclosure claim on the basis of the then-existing record. Accordingly, on December 17, 1985, we remanded the case to the district court for the limited purpose of holding an evidentiary hearing and making findings of fact and conclusions of law. We directed the district court to determine (1) whether there was an agreement or understanding

of any kind between the FBI and Greenfield about the possibility of a post-trial payment; (2) if such an agreement or understanding existed, its terms and conditions, including whether any payment was contingent upon conviction; and (3) under the new formulation of the materiality test set forth in *United States v. Bagley*, 105 S.Ct. at 3384, whether there was a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

We appreciate the district court's thorough treatment and prompt disposition of this matter on remand. The district court conducted extensive discovery proceedings, held an evidentiary hearing and made detailed findings of fact and conclusions of law. *United States v. Risken*, No. 84–44 (S.D.Iowa Feb. 12, 1986) (certified findings and conclusions on remand). The district court found that "no express agreement between Agent Root or anybody else on behalf of the FBI and Greenfield existed in advance of or during the trial concerning a post-trial payment to be made to Greenfield." *Id.* at 8. However, the district court found that

> *before and during the trial there was an implied understanding between Root, on behalf of the FBI, and Greenfield about the possibility of a post-trial payment to Greenfield.* There was no understanding as to the amount of the payment but there was an implied understanding that the making of such payment and the amount thereof might depend on whether [appellant] was convicted. This ultimate fact finding rests on the entire record made at the remand hearing. Among the more compelling evidentiary facts leading to this ultimate fact finding are: Greenfield's past experience in being paid as an FBI informant; the conversation between Greenfield and Root on May 4 [, 1984,] in which Green-

field was told that there would be compensation for reliable information and that the amount would depend upon the quantity and quality of the information; Greenfield had been paid for his services up to May 29 but he had received nothing for his services as a witness in two pretrial hearings and at the trial and for the extensive time he spent being debriefed by government agents in preparation for the trial, and he had received nothing for his degradation in the eyes of his social peers for becoming an FBI informant; Root's contemplation during the pretrial hearings and the trial of the possibility of paying Greenfield more after the trial; the FBI's occasional, if not common, practice of making payments after trial; the FBI's practice of considering a conviction, along with other factors, in deciding whether to make a payment; and last but not least, Greenfield's statements to people during the summer and early autumn of 1984 that he was going to receive a large payment or other handsome reward after the trial.

*Id.* at 8–9 (emphasis added). The district court concluded, however, that there was no reasonable probability that, had the implied understanding been disclosed to the defense, the result of the proceeding would have been different because Greenfield's testimony was corroborated by the tape recordings and "[p]rimarily, it was the tapes that convicted [appellant] on all counts." *Id.* at 9. The district court also concluded that disclosure of the implied understanding in the pretrial hearings would not have changed the ruling on the admissibility of the tape recordings. *Id.* at 10. The parties then submitted supplemental briefs.[6]

■ First, the fact that the $5,000 payment was contingent upon appellant's conviction would not alone require reversal. In *Williamson v. United States* the Fifth

6. In connection with the proceedings on remand, appellant also filed motions to hold the FBI in contempt, for appointment of a special grand jury pursuant to 18 U.S.C. § 3331 and a special prosecutor, and to dismiss all the counts of the indictment. The district court denied these motions, without opinion, by order dated February 18, 1986. Appellant filed a supplemental notice of appeal. We have reviewed appellant's additional objections and find no basis for reversal.

Circuit refused to sanction "a contingent fee agreement to *produce evidence against particular named defendants as to crimes not yet committed.*" 311 F.2d at 444 (Rives, J.) (emphasis added). Later Fifth Circuit cases limited the *Williamson* holding to cases involving similar facts, that is, to "cases in which the government directs the informant to implicate government-pretargeted specific defendants." *United States v. Yater,* 756 F.2d 1058, 1067 (5th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 225, 88 L.Ed.2d 226 (1985). It is the government's pre-selection or pre-targeting of specific persons for implication by the informant that violates due process, not the fact that the informant's fee is contingent upon conviction. *See, e.g., United States v. Dailey,* 759 F.2d 192, 199 (1st Cir.1985); *United States v. Valle-Ferrer,* 739 F.2d 545, 546–47 (11th Cir.1984) (per curiam) (fact that key government witness was eligible to receive a monetary award contingent upon defendant's conviction does not require reversal); *United States v. Walker,* 720 F.2d 1527, 1539–40 (11th Cir.1983), *cert. denied,* 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984). Appellant does not argue that the government pre-targeted him for conviction or that Greenfield was directed by the government to specifically implicate him.

We now turn to the nondisclosure claim. In *United States v. Bagley,* 105 S.Ct. at 3377, the Supreme Court reviewed the standard of materiality to be applied in determining whether the government's failure to disclose impeachment evidence warrants reversal of a conviction. In *Bagley,* evidence of the government's prior agreements to pay two government witnesses for their cooperation and testimony was not disclosed to the defense. The defendant filed a 28 U.S.C. § 2255 motion alleging that nondisclosure violated *Brady v. Maryland* because the agreements could have been used to impeach the government witnesses. The district court found that the government's failure to disclose was harmless error. The Ninth Circuit reversed, holding that "the government's failure to provide requested *Brady* information to

[the defendant] so that he could effectively cross-examine two important government witnesses requires automatic reversal." *Bagley v. Lumpkin,* 719 F.2d 1462, 1464 (9th Cir.1983).

The Supreme Court reversed. The majority of the Court emphasized that "[t]he holding in *Brady v. Maryland* requires disclosure only of evidence that is both favorable to the accused and 'material either to guilt or punishment' ... and 'that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial.'" *United States v. Bagley,* 105 S.Ct. at 3379–80 (Blackmun, J.), *citing Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. at 1196, *and United States v. Agurs,* 427 U.S. at 104, 96 S.Ct. at 2397. The Court expressly rejected any distinction between exculpatory and impeachment evidence for *Brady* purposes. *United States v. Bagley,* 105 S.Ct. at 3380–81, *citing Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). The majority stated that "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial," *United States v. Bagley,* 105 S.Ct. at 3381, and reformulated the standard of materiality applicable to nondisclosed evidence, *id.* at 3381–84. The Court replaced the framework for evaluating the materiality of *Brady* evidence established in *United States v. Agurs* with the following test: "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 3384; *id.* at 3385 (White, J., concurring in part and concurring in judgment). The Court further defined "a reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* at 3384, *citing Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984).

We have carefully reviewed the record in the present case and conclude, as did the

district court on remand, that under the *Bagley* standard of materiality there is no reasonable probability that the result of the trial would have been different had the $5,000 payment been disclosed to the defense and used by defense counsel to cross-examine Greenfield. *See United States v. Bagley,* 105 S.Ct. at 3384; *Fryer v. Nix,* 775 F.2d 979, 983–84 (8th Cir.1985); *United States v. Ben M. Hogan Co.,* 769 F.2d 1293, 1299 (8th Cir.1985); *see also United States v. Pflaumer,* 774 F.2d 1224, 1230 (3d Cir. 1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986); *Lindsey v. King,* 769 F.2d 1034, 1041–43 (5th Cir. 1985); *United States v. McKenzie,* 768 F.2d 602, 610 (5th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986); *United States ex rel. Smith v. Fairman,* 769 F.2d 386, 391–92 (7th Cir. 1985).

█ The government should have disclosed the implied understanding that existed between Greenfield and the FBI about the possibility of a post-trial payment. The defense could have used this information to further impeach Greenfield's credibility. Nonetheless, Greenfield's status as a paid government witness and his employment by the FBI as a paid informant had already been brought out before the jury, although the payments which had been disclosed to the defense and to the jury were substantially less than the post-trial payment. More importantly, however, the government's case did not depend upon Greenfield's testimony alone. *Cf. United States v. Bagley,* 105 S.Ct. at 3386–88 (Marshall, J., dissenting) (government's entire case hinged on testimony of two private security guards who aided government agency in its investigation of defendant; omission of evidence of witnesses' possible bias cannot be held harmless error); *United States v. Pflaumer,* 774 F.2d at 1230. Greenfield's testimony was strongly corroborated by the tape recordings of his conversations with appellant. We agree with the district court that the tape recordings constituted the critical incriminating evidence against appellant. At 1366. Under these circumstances, we cannot say that the government's failure to disclose the implied understanding between the FBI and Greenfield about the possibility of a post-trial payment is sufficient to undermine our confidence in the jury's verdict.

Our holding that the evidence not disclosed by the government in the present was not material under the *United States v. Bagley* standard should not be construed as approval of the government's conduct. The fact remains that the government's failure to disclose known evidence favorable to the accused is incompatible with *Brady v. Maryland,* even though nondisclosure in a particular case may not warrant reversal under the reformulated standard of materiality set forth in *United States v. Bagley. See United States v. Bagley,* 105 S.Ct. at 3386–90 (Marshall, J., dissenting); *id.* at 3398 & n. 1 (Stevens, J., dissenting) (*Brady* violation is by definition constitutional error). As stated by Justice Marshall in his dissenting opinion in *United States v. Bagley,* 105 S.Ct. at 3389 (citations omitted),

"[t]he purpose of a trial is as much the acquittal of an innocent person as it is the conviction of a guilty one." When evidence favorable to the defendant is known to exist, disclosure only enhances the quest for truth; it takes no direct toll on that inquiry. Moreover, the existence of any small piece of evidence favorable to the defense may, in a particular case, create just the doubt that prevents the jury from returning a verdict of guilty....

When the State does not disclose information in its possession that might reasonably be considered favorable to the defense, it precludes the trier of fact from gaining access to such information and thereby undermines the reliability of the verdict.... [T]he State's concern for a fair verdict precludes it from withholding from the defense evidence favorable to the defendant's case in the prosecutor's files.

Accordingly, the judgment of the district court is affirmed.