841 F.2d 1408
 25 Fed. R. Evid. Serv. 461
 UNITED STATES of America, Appellee,
v.
Daniel W. O'CONNELL, a/k/a Edward Smith, Appellant.
UNITED STATES of America, Appellee,
v.
Gregory J. COOKE, Appellant.
UNITED STATES of America, Appellee,
v.
Patrick Basil COLLIER, Appellant.
UNITED STATES of America, Appellee,
v.
William R. PATTERSON, II, Appellant.
UNITED STATES of America, Appellee,
v.
Richard Allen ST. CYR, a/k/a Dexter, Appellant.
 Nos. 86-5311 to 86-5315.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 8, 1987.
Decided March 14, 1988.
Rehearing Denied is No. 86-5315 April 8, 1988.
Rehearing and Rehearing En Banc Denied in No. 86-5312 April
25, 1988.
Rehearing and Rehearing En Banc Denied in No. 86-5311 May 3, 1988.
Rehearing and Rehearing En Banc Denied May 20, 1988.
 
 Alan S. Ross, Miami, Fla., for O'Connell.
 Andrew S. Birrell, Minneapolis, Minn., for Cooke.
 Charles L. Hawkins, St. Paul, Minn., for Collier.
 Mark Peterson, Minneapolis, Minn., for Patterson.
 Paul Engh, Minneapolis, Minn., for St. Cyr.
 Richard E. Vosepka, Asst. U.S. Atty., for appellee.
 Before McMILLIAN, Circuit Judge, FAIRCHILD,* Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 These appeals arise from the conviction of Daniel W. O'Connell, Gregory Cooke, Patrick Collier, William R. Patterson, and Richard Allen St. Cyr for thirty offenses related to the operation of a large marijuana distribution scheme in the Minneapolis, Minnesota area. The appellants were charged with eleven others who pleaded guilty, nine of whom testified at trial. Appellants were convicted of conspiracy and possession with intent to distribute marijuana and numerous other charges.[1] The primary issues raised on appeal involve the propriety of admitting evidence obtained from telephone wiretaps, the stop and search of an automobile, the admitting of an audiotape of telephone calls taken from a recording machine in O'Connell's warehouse, and the propriety of the district attorney's closing argument. Additional issues include the sufficiency of the evidence, the admission of evidence of other wrongful acts, and the denial of motions for severance. The judgment entered by the district court[2] is affirmed.
 
 
 2
 The drug operation giving rise to this prosecution had been in existence for several years before it was terminated by arrests and seizures in February of 1985. Daniel O'Connell and Gregory Cooke leased adjoining warehouse space in Opa Locka, Florida. When a shipment of marijuana was available, drivers would pick up the marijuana from these warehouses and transport it to Minnesota. At least four different Lincoln Continentals were used for these trips. Cooke paid drivers working for him $1,000 cash for each trip from Florida to Minnesota, and $500 cash for returning an empty Lincoln from Minnesota. Patrick Collier was among the drivers working for Cooke.
 
 
 3
 Timothy Lyons, the head of the Minnesota distribution network, testified on behalf of the government. He entered a guilty plea to a continuing criminal enterprise charge as part of an agreement that other charges would not be filed against him. In Minnesota, Lyons used several "stash houses" to direct distribution of the marijuana. Cooke and Lyons rented these houses and would change the location yearly, the last one being located in Maple Grove, Minnesota. From these houses, Lyons distributed marijuana to approximately ten dealers, including William Patterson and Richard St. Cyr. Patterson handled the largest volume and was the most dependable of Lyons' dealers. Deliveries to St. Cyr were considerably smaller because St. Cyr was incarcerated during most of the indictment period. Nonetheless, St. Cyr continued to distribute marijuana through others acting on his behalf. The marijuana was consigned or "fronted" at each level of distribution. As dealers collected from their customers, they would pay Lyons, who paid Cooke, who would in turn pay O'Connell. Unsold marijuana was returned. The cycle would begin again every three to six weeks with occasional "vacations".
 
 
 4
 The federal authorities' investigation into this case began in 1982 when a Drug Enforcement Administration agent received information that Timothy Lyons and his brother Casey were involved in drug trafficking. By the end of 1984, federal agents had run pen registers on telephones of four of the defendants, conducted surveillance of the organization, and observed several controlled buys. The agents compiled the information they had gathered in a wiretap application, which was approved on February 1, 1985. Wiretaps were placed on two telephone lines, one listed to Blue Star Trucking and used primarily by Timothy Lyons, and one listed to Charles O'Brien.[3]
 
 
 5
 The wiretap provided the government with substantial evidence linking all of the defendants except O'Connell to the conspiracy. The government offered fifty-six intercepted conversations in evidence at trial. Many of these related to collection efforts on behalf of Timothy Lyons and plans to transport shipments of marijuana from Florida.
 
 
 6
 Through the wiretap, agents discovered that Casey Lyons and Patrick Collier would be driving a load of marijuana from Miami on February 22, 1985, and were due to arrive in the Minneapolis area on the 25th. Search warrants were obtained for the Maple Grove "stash house," the residence of Timothy Lyons, the Florida warehouses rented by Cooke and O'Connell, and seven individuals, including Timothy Lyons and Cooke. Officers saw Casey Lyons drive a Lincoln Continental with license MLU-045 away from the Florida warehouse on February 22, 1985. The same vehicle was seen driving into the garage of the house in Maple Grove, Minnesota on February 25.
 
 
 7
 On February 25, 1985, federal and state agents conducted a search of the Maple Grove stash house. There they found numerous weapons, sizeable amounts of cash, and eight bales of marijuana weighing approximately 440 pounds. The officers also found notes relating to marijuana transactions, including an itemized list of 16 bales of marijuana which was written by Cooke and found in Timothy Lyons' possession. Several suspects were arrested at the house, including William Patterson and Patrick Collier. During the search, Special Agent Richard Anderson was stationed outside the house. He observed a Lincoln Continental pass by, pull into a driveway, then back out and return. Agent Anderson knew that Lincolns were involved in the operation. He stopped the car and after Cooke was identified as the driver, he was taken inside, searched, and arrested pursuant to warrant.
 
 
 8
 On the same day, eight more bales of marijuana, packaged like those found in Minnesota, were seized at O'Connell's Florida warehouse.[4] Also seized at O'Connell's warehouse was an audiotape of telephone calls from a recording machine, which contained conversations involving O'Connell and other members of the group. These conversations revealed that O'Connell had the keys for, knew the whereabouts of, and controlled the four Lincolns used in transporting marijuana to Minnesota, and included one call in which O'Connell discussed arrangements for a "round trip" in the near future. In another call, O'Connell stated that he was waiting for Cooke to arrive and "bring me my money." Notes found at Lyons' house showed drug debts of both Patterson and St. Cyr, and documents seized from various places reflected the organization's high level of profits.
 
 
 9
 On December 18, 1985, a federal grand jury in Minnesota returned a 75-count indictment charging sixteen individuals with various criminal violations. Eleven of the defendants pleaded guilty to one or more charges before trial, and nine of these testified for the government. On April 24, 1986, the remaining defendants, Gregory Cooke, William R. Patterson, Daniel W. O'Connell, Patrick Collier and Richard Allen St. Cyr, went to trial on the remaining twenty-five counts and a total of thirty-six charged offenses.
 
 
 10
 The trial was a long and heated affair. It continued for over five weeks, and closing arguments alone consumed two full days. When the dust had cleared, the jury was sent to deliberate on thirty-one charged offenses. Thirty verdicts of guilt were returned, which we have detailed above. See supra note 1. The district court sentenced O'Connell to twenty-five years imprisonment, a $250,000 fine, and a five-year special parole term. Cooke received twenty-five years imprisonment without parole pursuant to CCE provisions, a $100,000 fine, and a three-year special parole term. Patterson received ten years imprisonment, a $5,000 fine, and a three-year special parole term. St. Cyr was sentenced to eight years imprisonment, and Collier to five years imprisonment.
 
 
 11
 We affirm the judgment of the district court in all respects. Additional facts material to our determination of the issues raised on appeal are recited below.
 
 I.
 
 12
 Patterson, joined by Collier and St. Cyr, argues that the district court improperly ordered wiretaps for the telephones listed to Charles O'Brien and Blue Star Trucking and erroneously admitted the evidence obtained thereby. Patterson alleges four grounds of error, which we consider in turn.
 
 A.
 
 13
 First, Patterson contends that the government's application for the wiretap and the district court's order authorizing it failed to establish the ineffectiveness of normal investigative techniques. Patterson correctly argues that an application for a wiretap must contain a "full and complete statement" of the facts justifying an authorization order, including discussion of other investigative procedures. 18 U.S.C. Sec. 2518(1)(b), (c) (1982). In addition, an authorization order may only be granted "if the judge determines on the basis of the facts submitted by the applicant that * * * normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous * * *." 18 U.S.C. Sec. 2518(3)(c) (1982). Together these two sections create what the courts have called the "necessity requirement." United States v. Garcia, 785 F.2d 214, 223 (8th Cir.), cert. denied, 475 U.S. 1143, 106 S.Ct. 1797, 90 L.Ed.2d 342 (1986). Patterson argues that Agent Crosby's affidavit in support of the application was insufficient to meet the section 2518(1) standard. He also claims that traditional investigative techniques had been effective in this case and that additional methods were available which appeared reasonably likely to succeed and which were not unduly dangerous.
 
 
 14
 In reviewing determinations made by a district court in the context of a motion to suppress, we apply the clearly erroneous standard. United States v. Ross, 713 F.2d 389, 392 (8th Cir.1983). Under this standard, we ordinarily affirm a decision unless there is not substantial evidence to support it, it evolves from an erroneous view of the applicable law, or upon considering the entire record we are left with a definite and firm conviction that a mistake has been made. Id.
 
 
 15
 At the pre-trial suppression hearing, Magistrate J. Earl Cudd determined that it was nearly impossible for the government to discover the full scope of this drug conspiracy and the identities of the participants without the use of wiretaps. The magistrate noted that at least four of the persons indicted were initially identified through the wiretaps, and that the wiretaps enabled the government to determine which of its many suspects were actually involved in the conspiracy. See United States v. Daly, 535 F.2d 434, 439 (8th Cir.1976). Although the government had collected much evidence prior to the wiretap authorization, the magistrate found that this information revealed a large and far-flung conspiracy, Daly, 535 F.2d at 439, which presented more difficult investigative problems than a common, "small-time" narcotics ring, see United States v. Lilla, 699 F.2d 99, 104 (2d Cir.1983). Informants were unwilling to testify out of fear, and new informants could not be recruited because the Lyons organization only did business with those whom they had known for some time. See Daly, 535 F.2d at 439; cf. Lilla, 699 F.2d at 101, 104 (defendant not apprehensive about dealing with state trooper). The magistrate concluded that the authorizing district court did not abuse its discretion in finding the wiretaps necessary on the facts before it. This conclusion was adopted by the district court after conducting a de novo review. We cannot say these holdings were not supported by substantial evidence.
 
 
 16
 Patterson points to examples in the record to show that normal investigative techniques continued to generate useful evidence for the government and that additional methods might have provided further information. However, this court has consistently held that satisfying the provisions of section 2518(1)(c) and (3)(c) does not require the government to exhaust every available investigative technique before a wiretap may be authorized. In United States v. Losing, 560 F.2d 906 (8th Cir.), cert. denied, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977), we said:
 
 
 17
 Congress did not require the exhaustion of "specific" or "all possible" investigative techniques before wiretap orders could be issued. * * * Sections 2518(1)(c) and 2518(3)(c) are only designed to ensure that wiretapping is "not to be routinely employed as the initial step in criminal investigation" and "... to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."
 
 
 18
 560 F.2d at 910 (quoting Daly, 535 F.2d at 438). Our review of the record satisfies us that the magistrate and district court analyzed the information presented to the authorizing judge and available at that time in accordance with these principles. Although normal methods of investigation were successful in some respects, and a variety of others remained to be tried, the district court was entitled to authorize the wiretap if conventional techniques would not "suffice to expose the crime." Id. The district court's factual findings regarding the broad scope and complexity of this conspiracy indicated that the organization could not be adequately investigated through normal means, see Daly, 535 F.2d at 439, and this is sufficient to demonstrate compliance with the requirements of Losing. We accordingly affirm the district court's determination that there had been a proper showing to the authorizing district judge that normal investigative techniques had been ineffective, in accordance with sections 2518(1)(b), (c) and 2518(3)(c).
 
 B.
 
 19
 Patterson's second contention is that the district attorney's application for the wiretap order was improperly authorized within the Department of Justice. Although the application identifies the Assistant Attorney General in charge of the Criminal Division as the authorizing official, the authorization itself was obtained from the Assistant Attorney General for the Antitrust Division. The relevant statutory provision allows an Assistant Attorney General to authorize an application if "specially designated by the Attorney General." 18 U.S.C. Sec. 2516(1) (Supp. III 1985). The Attorney General's designation permits the Assistant for the Antitrust Division to authorize an application only if the Assistants for the office of Legal Counsel and the Tax and Criminal Divisions are unavailable. Order No. 931-81 (1981). Patterson argues that the government has not shown that the three Assistant Attorneys General with higher priority were unavailable, and that the Assistant in charge of the Criminal Division probably was available, because his title appears on the application. Patterson argues more generally that the discrepancy between the application and the authorization raises an issue as to the propriety of the authorization, which the government has not explained.
 
 
 20
 The Second Circuit has recently stated, and we agree, that "a named designee whose high office [gives] him statutory power to authorize electronic surveillance orders * * * is presumed to have properly exercised that power and the condition[s] precedent [are] presumed to have been met unless the defendants offer evidence, apart from mere conjecture or speculation, to rebut this presumption." United States v. Terry, 702 F.2d 299, 311 (2d Cir.) (citations omitted), cert. denied, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983). Patterson has offered no evidence to rebut the presumption that the power to authorize surveillance was properly exercised, and his argument as to the availability of the Assistant Attorney General for the Criminal Division is speculative at best. In our view, the reason why the Assistant Attorney General for the Antitrust Division authorized the application was sufficiently explained by the declaration of Frederick Hess, Director of Enforcement Operations, who verified the unavailability of the officers with higher priority.
 
 
 21
 Moreover, the fact that the application misidentifies the authorizing official does not render interceptions conducted under the order unlawful. The Assistant Attorney General for the Antitrust Division possessed statutory and delegated power to authorize the application, and the fact that he did so rather than the Assistant Attorney General for the Criminal Division does not establish that the communications were "unlawfully intercepted" within the meaning of section 2518(10)(a)(i) (1982). See United States v. Chavez, 416 U.S. 562, 574-75, 579-80, 94 S.Ct. 1849, 1855-56, 1858, 40 L.Ed.2d 380 (1974); United States v. John, 508 F.2d 1134, 1137 (8th Cir.), cert. denied, 421 U.S. 962, 95 S.Ct. 1948, 44 L.Ed.2d 448 (1975); United States v. Bohn, 508 F.2d 1145, 1147 (8th Cir.), cert. denied, 421 U.S. 947, 95 S.Ct. 1676, 44 L.Ed.2d 100 (1975). As we read the record, the authorization for the wiretap was attached to the district attorney's application. This authorization plainly identifies the Assistant Attorney General for the Antitrust Division as the authorizing official. Thus, the inconsistency between the two documents was a matter fully presented to the district court, and any discrepancies seized upon by Patterson are of insufficient substance to call for suppression of the wiretaps.
 
 C.
 
 22
 Patterson's third argument is that the government did not minimize its interception of irrelevant conversations as required by the district court's wiretap order, which incorporated the relevant statutory provision. 18 U.S.C. Sec. 2518(5) (1982).[5] Patterson also contends that the government disregarded its pledge, contained in the wiretap application, to terminate monitoring of any conversations which were non-criminal in nature, even if suspected conspirators were involved. As we read the statute, these two allegations are the same. See 18 U.S.C. Secs. 2516(1)(a)-(l ), 2518(5). The central question is whether the government complied with its statutory mandate.
 
 
 23
 In reviewing the government's compliance with section 2518(5), we apply an objective standard which measures the reasonableness of the investigator's conduct in light of the facts and circumstances confronting him at the time. Scott v. United States, 436 U.S. 128, 135-39, 98 S.Ct. 1717, 1722-24, 56 L.Ed.2d 168 (1978). Subjective good faith is not required by the statute or by the fourth amendment. Id. We have identified a number of factors which are relevant to this determination, including the scope of the criminal enterprise under investigation, the government's reasonable expectation of the content of a particular call, and the extent of judicial supervision. Garcia, 785 F.2d at 224. The issue is one of fact, and we review the district court's determination under the clearly erroneous standard. Id.
 
 
 24
 Patterson offers two arguments to support his position. First, he contends that the government openly disregarded the minimization requirements shortly after wiretapping began. The government's first progress report to the district court stated that agents had been directed to thoroughly monitor calls, even those unrelated to criminal activity, because a high percentage of the calls initially monitored contained drug conversations at some point. Patterson claims that this report, together with other evidence, establishes a per se violation of section 2518(5). Second, Patterson claims that the monitoring agents disregarded instructions contained in the Justice Department's authorization to avoid intercepting calls involving persons under criminal charges if the conversations pertained to culpability or defense strategy. See 18 U.S.C. Sec. 2518(10)(a)(iii). Patterson contends that the government intercepted at least two such conversations.
 
 
 25
 These arguments must be rejected. In the first place, section 2518(5) does not establish a per se rule regarding minimization. Each case must be decided on its particular facts. Scott, 436 U.S. at 139-40, 98 S.Ct. at 1724-25. In this case, the magistrate determined that the large scope of the conspiracy and the frequency of drug-related conversations justified extensive monitoring. He also found that the supervising judge was promptly notified of the government's decision to fully monitor all calls involving suspected conspirators. These findings, which were adopted by the district court, are supported by the record and considered by themselves are sufficient to satisfy the requirements of section 2518(5). See Garcia, 785 F.2d at 224. Nonetheless, approximately 200 of an estimated 660 calls were minimized following the progress report, and some 420 of the intercepted calls related to drug activity. We cannot blindly rely on the percentage of non-pertinent calls intercepted, but such figures do provide assistance. Scott, 436 U.S. at 140, 98 S.Ct. at 1724. When viewed in light of the other evidence available to the district court, we cannot say the court's determination that the monitoring agents complied with section 2518(5) was clearly erroneous. Ross, 713 F.2d at 392.
 
 
 26
 Along similar lines, we note that the Justice Department's authorization did not prohibit monitoring calls involving persons facing criminal charges, but only expressed a policy of reasonable avoidance. This stance was entirely in keeping with section 2518(5). Scott, 436 U.S. at 140-41, 98 S.Ct. at 1724-25. Although two intercepted calls did contain material relating to the culpability of one defendant on a DWI charge, both of them also involved drug activity and neither pertained to defense strategy. The district court was therefore entitled to conclude that the investigators did not exceed the scope of their authorization in monitoring these calls. Id. at 141, 98 S.Ct. at 1725.
 
 D.
 
 27
 Patterson's final argument is that the government improperly disclosed the contents of intercepted conversations. According to Patterson, the wiretap order required that all persons having access to the conversations be specially deputized and act under DEA direction, and record evidence demonstrates that the secretaries and intelligence analyst given access failed on one or both of these counts. Patterson further contends that the disclosure was not authorized by statute, either as a disclosure "to another investigative or law enforcement officer" or as a "use * * * appropriate to the proper performance of [the investigative officer's] official duties." 18 U.S.C. Sec. 2517(1), (2) (1982). In his view, introduction of the evidence at trial was therefore improper. See 18 U.S.C. Sec. 2515 (1982).
 
 
 28
 We reject this argument. The disclosures to the secretaries and intelligence analyst were probably valid under section 2517(2). In any event, the remedy of suppression is available for wrongful disclosure under Title III only if the conditions set forth in 18 U.S.C. Sec. 2518(10)(a) are satisfied. United States v. Donovan, 429 U.S. 413, 432, 97 S.Ct. 658, 670, 50 L.Ed.2d 652 (1977); U.S. v. Giordano, 416 U.S. 505, 524-25, 94 S.Ct. 1820, 1831, 40 L.Ed.2d 341 (1974); Chavez, 416 U.S. 562, 571, 94 S.Ct. at 1854. Each of these conditions involves the lawfulness of the interception itself. A litigant seeking suppression must demonstrate that the disclosure was wrongful, 18 U.S.C. Secs. 2515, 2517, and that the initial interception was unlawful, 18 U.S.C. Sec. 2518(10)(a). See Resha v. United States, 767 F.2d 285, 287-89 (6th Cir.1985), cert. denied, 475 U.S. 1081, 106 S.Ct. 1458, 89 L.Ed.2d 716 (1986). We have already determined that the interceptions involved in this case were legally obtained, and conclude that the district court was not required to suppress the wiretap evidence on the ground of wrongful disclosure.
 
 
 29
 Having considered and rejected each of the defendants' arguments regarding the wiretaps placed on the O'Brien and Blue Star telephones, we conclude that the evidence obtained through the wiretaps was properly admitted into evidence.[6]
 
 II.
 
 30
 Cooke argues that the district court erred in admitting evidence obtained by Agent Anderson's stop of the Lincoln Continental which Cooke drove past the Maple Grove house on February 25, 1985, and the subsequent search of Cooke's person. He claims that the stop was unconstitutional and that the evidence obtained should therefore have been suppressed. Wong Sun v. United States, 371 U.S. 471, 482, 83 S.Ct. 407, 414, 9 L.Ed.2d 441 (1963). He particularly complains that evidence of his very presence near the stash house, which was revealed by the stop of the car, was incriminating and prejudicial, requiring reversal of his convictions. See Chapman v. California, 386 U.S. 18, 22-24, 87 S.Ct. 824, 827-28, 17 L.Ed.2d 705 (1967).
 
 
 31
 Stopping an automobile and detaining its occupants constitute a "seizure" within the meaning of the fourth amendment. Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). Traditionally, an officer may not stop a vehicle unless he has an appropriate warrant, probable cause, or a reasonable suspicion that the occupants have been, are, or will be involved in criminal activity. Prouse, 440 U.S. at 654-55, 99 S.Ct. at 1396-97. In this case Agent Anderson did not have a warrant for Cooke or the Lincoln, and the parties debate whether Anderson had probable cause to stop the car or a reasonable suspicion of its occupants. The district court found that Agent Anderson had probable cause based on the collective knowledge of all the officers at the scene. The government argues, in support of the district court's ruling, that the knowledge of other agents on a search team may be imputed to the detaining officer. United States v. Wright, 641 F.2d 602, 606 (8th Cir.), cert. denied, 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981); United States v. Stratton, 453 F.2d 36, 37 (8th Cir.), cert. denied, 405 U.S. 1069, 92 S.Ct. 1515, 31 L.Ed.2d 800 (1972).
 
 
 32
 We review the district court's factual findings concerning the circumstances justifying the stop under the clearly erroneous standard. United States v. Wantland, 754 F.2d 268, 270 (8th Cir.1985). The district court found that although Agent Anderson was not personally able to identify Cooke or aware of the significance of this Lincoln, other agents present on the scene had knowledge of both. Agent Lee Urness had observed the same car, with Cooke and Timothy Lyons inside, pull up to the Maple Grove house on the night before the search. Agent Anderson did know that Lincoln Continentals were involved in the operation. In addition, many of the officers, including Urness, were aware that Cooke had been implicated in the organization, and they possessed a valid warrant to search Cooke's person. The officers were also aware of the organization's size and its potential for violence. Many of their hypotheses about the group were confirmed as they searched the house, where they found over 440 pounds of marijuana, loaded weapons in plain view, and six suspects. The search itself commenced some time before Cooke appeared outside the house. On the basis of this information, the district court concluded that the collective knowledge of the search team was sufficient to establish probable cause for beliefs that Cooke occupied the passing Lincoln and that he was involved in unlawful drug activity. These determinations are not clearly erroneous. See id.
 
 
 33
 Cooke does not challenge the district court's factual findings. He argues that the court's decision was based on an erroneous view of the applicable law, because Anderson personally did not have sufficient knowledge to constitute probable cause. In United States v. Wright, supra, this court found probable cause for the seizure of objects not specified in a warrant although there was no evidence that the seizing officer personally had probable cause or that he acted at the order or direction of an officer with probable cause. Wright, 641 F.2d at 606. The decision was based on the theory that consideration of the collective knowledge of the search team was appropriate because the officers had worked closely together during the investigation for the warrant. Id. See also Stratton, 453 F.2d at 37. Similar facts are present here. In such circumstances, we presume that the officers have shared relevant knowledge which informs the decision to seize evidence or to detain a particular person, even if the acting officer is unable to completely and correctly articulate the grounds for his suspicion at the time of the search. Wright, 641 F.2d at 606; White v. United States, 448 F.2d 250, 254 (8th Cir.1971), cert. denied, 405 U.S. 926, 92 S.Ct. 974, 30 L.Ed.2d 798 (1972). It is well-settled that "[t]he test of probable cause is not the articulation of the policeman's subjective theory but the objective view of the facts." White, 448 F.2d at 254 (quoting Dodd v. Beto, 435 F.2d 868, 870 (5th Cir.1970), cert. denied, 404 U.S. 845, 92 S.Ct. 145, 30 L.Ed.2d 81 (1971)).
 
 
 34
 We recognize that the length and complexity of an investigation may preclude a detaining officer from acquiring or consistently maintaining probable cause or a reasonable suspicion of every party under investigation. See Stratton, 453 F.2d at 37. In cases like the present one, involving a thorough and time-consuming investigation, we believe that the collective knowledge theory strikes an appropriate balance between the individual's fourth amendment interests and the government's legitimate interest in successfully investigating drug organizations of considerable scope and complexity. See Prouse, 440 U.S. at 654-55, 99 S.Ct. at 1396-97. The theory is amply supported by the law of this circuit. See United States v. Newton, 788 F.2d 1392, 1395 (8th Cir.1986); Wright, 641 F.2d at 606; United States v. Heisman, 503 F.2d 1284, 1290 (8th Cir.1974); Stratton, 453 F.2d at 37-38; White, 448 F.2d at 253-54. We therefore affirm the district court's denial of Cooke's motion to suppress.
 
 III.
 
 35
 O'Connell argues that the district court improperly admitted into evidence an audiotape found on a recording machine during the execution of a search warrant at O'Connell's Florida warehouse. O'Connell claims that the government failed to authenticate the tape as required by Fed.R.Evid. 901(a). He relies upon United States v. McMillan, 508 F.2d 101 (8th Cir.1974), cert. denied, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975), which sets forth seven foundational requirements for admitting tape recordings into evidence. Id. at 104. He argues that the government failed to show the authenticity and correctness of the recording; that changes, additions or deletions had not been made in it; that the speakers were identified; and that the conversations were made voluntarily and in good faith. Id.
 
 
 36
 In response to these arguments, the government contends that it did lay a "McMillan -type" foundation for the tape, from which the district court could reasonably conclude that the tape was used by O'Connell to record his conversations and those of others using his phones. The government argues that the accuracy of the conversations was corroborated by testimony and documents unrelated to the tape's seizure. As to the integrity of the tape, the government argues that the only post-seizure change was an inadvertent overrecording covering just three to five seconds on an irrelevant portion of the tape. See United States v. Risken, 788 F.2d 1361, 1370 (8th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 329, 93 L.Ed.2d 302 (1986); United States v. Johnson, 767 F.2d 1259, 1271 (8th Cir.1985). The government notes that it was able to identify at least one voice on every conversation, and two or more on a majority of the conversations. Each conversation contained the identified voice of at least one conspirator. Finally, the government argues that the district court was entitled to infer from the totality of the evidence that the conversations were made voluntarily and in good faith.
 
 
 37
 Our earlier decisions dealing with admission of sound recordings have involved the use of a recording device by the government or at the government's request to record the statements of participants in criminal activity. Many of the cases involve body microphones placed on an informant or government agent, and some involve recording equipment placed on telephones. The McMillan requirements have been applied primarily to such recordings.[7] We have recognized that the McMillan criteria "become meaningful only when viewed in light of the facts of a specific case," Durns, 562 F.2d at 547, and we are satisfied that the McMillan criteria have particular application to government usage of recording equipment, where special concerns may arise regarding the competence and reliability of inculpatory evidence. See id. When the facts demonstrate that the recording was made by a defendant, we believe the considerations underlying the McMillan test should be applied in a practical light to assure the reliability of the recorded material. We do not believe, however, that under such circumstances mechanical or wooden application of the McMillan requirements is necessary. Private use of recording equipment has become widespread, and the products of such devices can have the same significance as the products of a pen or typewriter, which might also be seized with a search warrant and offered into evidence. All require a sufficient showing of authenticity to be admissible, but this does not mean that a recording found in a defendant's possession should be subject to the same requirements we apply when a government agent or informant initiates a conversation knowing that it is to be recorded.
 
 
 38
 Applying these principles, we are satisfied that the government laid a proper foundation for introduction of the O'Connell tape. First, we believe the government has offered sufficient circumstantial evidence of the authenticity and correctness of the recordings. See United States v. Hassell, 547 F.2d 1048, 1054-55 (8th Cir.1977) (authenticity may be established circumstantially). The tape was found on a recording machine in O'Connell's Florida warehouse, and toll records collected by the government indicate that the recorded calls were made to or from that warehouse, or O'Connell's local residence. O'Connell's voice was positively identified on thirteen of the seventeen conversations at issue. The parties stipulated to the authenticity of two non-incriminating calls, and Agent Fisher and Timothy Lyons testified to the authenticity of two additional calls in which they participated. The accuracy of these conversations is evidence of the accuracy of the others; it is not necessary for the government to verify the accuracy of every part of a recording. McMillan, 508 F.2d at 104-105. In addition, the accuracy of the conversations incriminating to O'Connell was confirmed in part by the testimony of other conspirators and other government evidence, which established activities of the drug ring similar to the events discussed on the tape. "In view of the identity between the scenario arranged on the telephone and that subsequently enacted, * * * 'the substance of the communication may itself be enough to make prima facie proof.' " Id. at 105 (quoting United States v. Bonanno, 487 F.2d 654, 659 (2d Cir.1973)). Finally, we observe that the tape contained many statements by various parties which were against their penal interests. Such statements are traditionally considered reliable, Fed.R.Evid. 804(b)(3), and may be admitted if corroborated by circumstances clearly indicating their trustworthiness. United States v. Eagle Hawk, 815 F.2d 1213, 1217 (8th Cir.1987); United States v. Hardrich, 707 F.2d 992, 994 (8th Cir.), cert. denied, 464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983). We are satisfied the evidence offered by the government meets that standard, providing an additional reason for admitting the tape.
 
 
 39
 Second, the integrity of the recordings was established by the testimony of Agent Thomas Fisher, who had custody of the tape after its seizure. He stated that the only change in the tape was a very brief and inadvertant overrecording on a completely silent passage which was not even offered into evidence. This "gap" was not of sufficient import to block foundation. See Risken, 788 F.2d at 1370; Johnson, 767 F.2d at 1271. Moreover, we do not believe the government should be required to prove directly the pre-seizure integrity of a tape found in a defendant's possession. In our view, a prima facie showing of the authenticity and correctness of a recording is sufficient circumstantial evidence of its pre-seizure integrity. Cf. Panas, 738 F.2d at 286-87 (testimony of authenticity and correctness, together with testimony that parts of tape were free from changes, sufficient to establish integrity of tape); Hassell, 547 F.2d at 1054-55 (authenticity may be established circumstantially). In this case, as we have said, the government made a sufficient showing of the tape's accuracy.
 
 
 40
 Third, the speakers were adequately identified through the testimony of Agent Fisher, Timothy Lyons, and Steven Sjolund. Together they identified the voice of at least one conspirator on every conversation, and two or more voices were identified on a majority of the conversations. O'Connell's voice was identified on thirteen of the seventeen conversations at issue, Cooke's on ten conversations, and Timothy Lyons' on one conversation. Berta Rodon, a close associate of O'Connell, was identified on two conversations. O'Connell complains that the government did not establish the identity of every speaker on every conversation, but we do not believe that under these circumstances the government can reasonably be expected to do so. We have upheld tentative, Risken, 788 F.2d at 1370, and circumstantial identifications of speakers, Hassell, 547 F.2d at 1054-55, and we observe that in this case government testimony and transcripts of the conversations clearly distinguished the identified from the unidentified voices, so there was little danger of jury confusion, see Gordon, 688 F.2d at 44; see also United States v. McCauley, 601 F.2d 336, 339 (8th Cir.1979). The witnesses' testimony firmly established their personal familiarity with the voices of the identified speakers. In the present circumstances, we believe this was sufficient to satisfy McMillan's concern with adequate voice identification. See Risken, 788 F.2d at 1370.
 
 
 41
 Finally, McMillan requires a showing "[t]hat the conversation elicited was made voluntarily and in good faith, without any kind of inducement." 508 F.2d at 104 (emphasis added). The phrasing of this requirement indicates that it was intended to apply primarily to cases of government or informant-initiated conversations. When private conversations are involved, we believe a simple showing of voluntariness will ordinarily be sufficient. In this case, as we have said, the government offered evidence that the tape was found on a telephone answering machine in O'Connell's warehouse, that O'Connell's voice is repeatedly recorded on it, and that the recorded calls were made to or from that warehouse, or O'Connell's local residence. In addition, the contents of the tape indicate that the conversations were voluntary between the parties in the completion of their activities, and no evidence was offered to the contrary. Taken together, we believe this evidence was sufficient to establish the voluntariness of the recorded conversations.[8]
 
 
 42
 The decision to admit tape recordings is subject to reversal only for a clear abuse of discretion. Johnson, 767 F.2d at 1271. Having considered all of O'Connell's objections to the introduction of these recordings, we are convinced that the district court did not err in denying O'Connell's motion to suppress. The record contained sufficient evidence for the court to conclude that the tape was used by O'Connell to tape his conversations and those of others using his phones. This was enough to satisfy Fed.R.Evid. 901(a).
 
 IV.
 
 43
 Patterson and St. Cyr argue that the district court erred in admitting wrongful act evidence under Fed.R.Evid. 404(b). In this circuit, evidence of other crimes, wrongs or acts is admissible if it is relevant to a material issue; it is clear and convincing; it is more probative than prejudicial; and the other acts are similar in kind and close in time to the crime charged. United States v. Miller, 725 F.2d 462, 466 (8th Cir.1984). We consider 404(b) a rule of inclusion, permitting admission of such evidence unless it tends to prove only the defendant's criminal disposition. United States v. Wagoner, 713 F.2d 1371, 1375 (8th Cir.1983). The trial court is vested with broad discretion in determining whether to admit wrongful act evidence, and its decision will not be overturned unless it is clear that the evidence had no bearing upon any of the issues involved. Id.; United States v. Marshall, 683 F.2d 1212, 1215 (8th Cir.1982).
 
 
 44
 The controverted evidence consists of several intercepted telephone conversations which reflect the violent propensities of Patterson, St. Cyr, and other conspirators. In one conversation, Patterson offered to provide Timothy Lyons with a hand grenade, which Lyons said he would throw into the living room of a dealer who had not been paying his debts. In other conversations, St. Cyr said he felt like "stabbing somebody," escaping from prison, and eluding arrest. These conversations were edited, but not to the extent requested by St. Cyr. Finally, one reference to St. Cyr's conviction for attempted murder was mistakenly included in transcripts of St. Cyr's conversations.
 
 
 45
 With regard to the conversations themselves, our review of the record satisfies us that they were directly relevant to material issues involved in the offenses with which each defendant was charged. Marshall, 683 F.2d at 1215. Patterson's telephone conversation was evidence of his knowing contribution to Timothy Lyon's drug organization, supporting his convictions for conspiracy, Garcia, 785 F.2d at 225, and for using a telephone to facilitate drug distribution, United States v. Jones, 801 F.2d 304, 311-12 (8th Cir.1986); United States v. Grego, 724 F.2d 701, 704 (8th Cir.1984).
 
 
 46
 St. Cyr's telephone conversations also reflect his knowing participation in the drug operation and his willingness to threaten violence to ensure efficient drug distribution and payment collection. They were therefore relevant to his conspiracy and telephone convictions, as well. We recognize that the tapes contained prejudicial material and that the conversations permitted inferences regarding the defendants' character. However, balancing probative value against prejudicial impact rests primarily within the district court's discretion, Marshall, 683 F.2d at 1216; United States v. Milham, 590 F.2d 717, 721 (8th Cir.1979), and wrongful act evidence which reflects upon a defendant's character may be admitted for other, legitimate purposes, Fed.R.Evid. 404(b); Miller, 725 F.2d at 466. The court gave the jury appropriate limiting instructions for its use of this evidence. Miller, 725 F.2d at 466; Wagoner, 713 F.2d at 1376. On this record, we cannot say that the district court abused its discretion in admitting these conversations or in refusing to edit them further.
 
 
 47
 The issue is closer with regard to the transcripts in which St. Cyr commented upon his conviction for attempted murder. The district court stated that the remark was highly prejudicial. Moreover, the reason for St. Cyr's incarceration was not relevant to any material issue in his trial. By agreement with defense counsel, the government deleted the comment from the tapes, which were admitted into evidence and played for the jury, but the government failed to edit it from at least some of the transcripts furnished to the jurors.
 
 
 48
 The parties debate whether the comment was included in all of the transcripts and whether the jury read or even had time to read it. This is a factual issue we may not resolve, but we note that the Fifth Circuit, in an identical situation, applied the harmless error rule to determine if reversal was warranted. United States v. Colacurcio, 659 F.2d 684, 687 n. 2 (5th Cir.1981), cert. denied, 455 U.S. 1002, 102 S.Ct. 1635, 71 L.Ed.2d 869 (1982). In addition, we believe the present situation is analogous to those in which a prosecutor improperly comments upon or inquires into the reason a defendant is incarcerated. See, e.g., United States v. Auerbach, 682 F.2d 735, 738 (8th Cir.), cert. denied, 459 U.S. 911, 103 S.Ct. 219, 74 L.Ed.2d 174 (1982). In such cases, where proper objection is made, we apply the harmless error rule. United States v. Lee, 743 F.2d 1240, 1254 (8th Cir.1984). We evaluate the prosecutor's conduct against the trial record as a whole, United States v. Boyce, 797 F.2d 691, 694 (8th Cir.1986), and reversal is necessary "only if * * * the jury verdict could reasonably have been affected" by the comment. Lee, 743 F.2d at 1254.
 
 
 49
 Our review of the record satisfies us that even if the jury read the comment, the government's error was harmless. Although the reason for St. Cyr's imprisonment was otherwise kept from the jury, the fact of his incarceration was unavoidably mentioned in explaining the nature of his participation in the conspiracy and his use of prison telephones to facilitate drug distribution. See Auerbach, 682 F.2d at 739-40. In light of these repeated references to his incarceration, any additional prejudice generated by an isolated statement of the reason for it must be considered slight. The prosecutor did not comment upon or emphasize the remark in any way, and the record contained other properly admitted evidence of St. Cyr's violent propensities, as we have explained above. Finally, the district court properly instructed the jury that the transcripts were not evidence, but were provided for guidance only, and that any inconsistencies between the tapes and transcripts should be resolved in favor of the tapes. United States v. Voss, 787 F.2d 393, 402 (8th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 286, 93 L.Ed.2d 261 (1986); McMillan, 508 F.2d at 105-106. On this record, we cannot say that the government's error could reasonably have affected the verdict, and we accordingly hold it harmless. Lee, 743 F.2d at 1254.
 
 V.
 
 50
 Defendants O'Connell, Cooke, St. Cyr and Collier challenge the sufficiency of the evidence supporting several of their convictions. In considering the sufficiency of the evidence, we must view the evidence in the light most favorable to the government, giving the government the benefit of all reasonable inferences which may logically be drawn therefrom. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); United States v. Resnick, 745 F.2d 1179, 1185 (8th Cir.1984). The evidence need not exclude every reasonable hypothesis of innocence, but simply "be sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty." United States v. Wells, 721 F.2d 1160, 1161 (8th Cir.1983) (quoting United States v. Taylor, 599 F.2d 832, 838 (8th Cir.1979)). If the evidence rationally supports two conflicting hypotheses, a reviewing court will not not disturb a conviction. United States v. Keck, 773 F.2d 759, 769 (7th Cir.1985). Indeed, this court may overturn the verdict only if the evidence properly viewed is such that "a reasonable-minded jury must have entertained a reasonable doubt as to the government's proof of one of the essential elements of the offense." United States v. Noibi, 780 F.2d 1419, 1421 (8th Cir.1986).
 
 
 51
 O'Connell challenges the sufficiency of the evidence supporting his convictions for conspiracy and possession. As to the conspiracy count, we have held that "[o]nce the existence of a conspiracy is established, even slight evidence connecting a defendant to the conspiracy may be sufficient proof of his involvement in the scheme." United States v. Schmaltz, 562 F.2d 558, 560 (8th Cir.), cert. denied, 434 U.S. 957, 98 S.Ct. 485, 54 L.Ed.2d 315 (1977). O'Connell does not challenge the government's proof of the conspiracy; he argues that his participation has not been shown. However, there was evidence from which a jury could conclude that O'Connell was the source of the seized marijuana. O'Connell's warehouse space was adjacent to Cooke's, and there was evidence that drug loads were picked up at these warehouses. Officers observed the same Lincoln drive away from the warehouses in Florida and into the garage of the stash house in Minnesota. The government introduced a list written by Cooke and taken from Timothy Lyons at the Maple Grove house, which showed a total shipment of 16 bales of marijuana. Eight bales were found at the stash house, and eight similar bales were found in a vault-like room at the back of O'Connell's Florida warehouse. It was stipulated that the weights of the bales corresponded to the weights indicated on the list. The scene at O'Connell's warehouse was consistent with an inference that all of the marijuana had been stored there. Two-by-fours had been placed under the bales of marijuana, and other two-by-fours were lying in a corner of the room. There was ample space for all 16 bales, and at least one bag seized in Minnesota bore markings like those of a bale found in Florida. Eleven nylon-type air drop bags containing marijuana residue were also found in the vault. There was also evidence from which a jury could conclude that Cooke paid O'Connell for marijuana. There was testimony that Cooke and Timothy Lyons exchanged briefcases with Berta Rodon and another female at a Howard Johnson's Restaurant in St. Paul, and that shortly thereafter Rodon called O'Connell before catching a plane to Miami. Casey Lyons testified that he left briefcases full of money to pay for the marijuana in the Lincolns in Miami. There was also evidence that O'Connell controlled the Lincolns used to transport the marijuana from Florida to Minnesota, and that he helped supply drivers and directed their trips. Finally, pen registers showed contacts between various home and business telephones of O'Connell and Cooke when significant activities were occurring within the drug operation over a period of at least two years. This evidence was sufficient to prove that O'Connell "knowingly contributed" to the conspiracy's furtherance, Garcia, 785 F.2d at 225, by affirmatively cooperating in the scheme, United States v. Brown, 584 F.2d 252, 262 (8th Cir.1978), cert. denied, 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979).
 
 
 52
 We also believe the evidence is sufficient to sustain O'Connell's conviction for possession of the marijuana seized at the Maple Grove stash house on February 25, 1985. We have outlined above the evidence concerning the bales of marijuana seized from the stash house in Minnesota and O'Connell's warehouse in the Miami area. From this evidence the jury could find that O'Connell was the source of the seized drugs, and this supports a finding of constructive possession. See United States v. Wajda, 810 F.2d 754, 763 (8th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987); United States v. Buckhanon, 505 F.2d 1079, 1081 (8th Cir.1974); United States v. Madden, 482 F.2d 850, 851-52 (8th Cir.), cert. denied, 414 U.S. 1026, 94 S.Ct. 453, 38 L.Ed.2d 318 (1973). The government also offered evidence that the entire organization worked on a consignment basis, so that O'Connell retained an interest in drugs he supplied until they were sold. This also supports an inference of constructive possession, because constructive possession may be joint among several defendants; it need not be exclusive. United States v. Caspers, 736 F.2d 1246, 1249 (8th Cir.1984); Wells, 721 F.2d at 1162. Finally, although mere presence or association with a person who controls drugs is insufficient by itself to prove possession, both are circumstantial evidence of possession. See United States v. Larson, 760 F.2d 852, 858 (8th Cir.), cert. denied, 474 U.S. 849, 106 S.Ct. 143, 88 L.Ed.2d 119 (1985); United States v. Batimana, 623 F.2d 1366, 1369 (9th Cir.), cert. denied, 449 U.S. 1038, 101 S.Ct. 617, 66 L.Ed.2d 500 (1980). As we have said, here the government offered evidence of O'Connell's longstanding relationship with Cooke, and of the degree to which their association was related to drug activity. We are satisfied that the evidence viewed in its entirety was sufficient to support a finding of O'Connell's guilt. See Wells, 721 F.2d at 1161.
 
 
 53
 Cooke argues that the evidence was insufficient to prove that he was engaged in a continuing criminal enterprise (CCE) or that he had willfully filed a false income tax return for 1983. As to the CCE charge, the government offered evidence that Cooke directly managed at least five people, including distributor Timothy Lyons; drivers Sjoland, Collier, and Casey Lyons; and Cheryl Cooke, who passed messages and received payments for her husband. This was sufficient to establish his supervisory role in the organization, as required by 21 U.S.C. Sec. 848(d)(2)(A). See Jones, 801 F.2d at 308-10; United States v. Becton, 751 F.2d 250, 254-55 (8th Cir.1984), cert. denied, 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985). There was also evidence that substantial amounts of money and marijuana passed through the parties' hands, and that over $75,000 went directly to Cooke. This was enough to prove that he obtained "substantial income or resources" from the operation, as required by 21 U.S.C. Sec. 848(d)(2)(B). See Jones, 801 F.2d at 310-11. As these are the only elements of the CCE charge Cooke challenges, we affirm his conviction on that count.[9]
 
 
 54
 As to the tax count, the government offered testimony and financial analysis to show that Cooke's expenditures during the years in question exceeded his reported income, and that he voluntarily and intentionally failed to disclose the earnings used to meet those expenses. This method of proof was entirely proper, Clinkscales v. United States, 729 F.2d 940, 941-42 (8th Cir.1984) (per curiam), and the evidence was sufficient to show that Cooke willfully made false declarations of material fact on his tax return, as required by 26 U.S.C. Sec. 7206(1), id.[10]
 
 
 55
 St. Cyr argues that the evidence was insufficient to establish his participation in the conspiracy, 21 U.S.C. Secs. 841(a)(1), 846, or his use of a telephone to facilitate distribution of marijuana, 21 U.S.C. Sec. 843(b). However, the government offered testimony, intercepted wire communications, drug notes and other evidence which indicated that St. Cyr used the telephone and other means to arrange and direct drug transactions with alleged co-conspirators while he was incarcerated. This evidence was sufficient to support his conspiracy conviction, because it provided a basis for concluding that St. Cyr "knowingly contributed" to the conspiracy's furtherance, Garcia, 785 F.2d at 225, by affirmatively cooperating in the scheme, Brown, 584 F.2d at 262. The same evidence was also sufficient to support St. Cyr's conviction for two counts of using a telephone to facilitate drug distribution. See Jones, 801 F.2d at 311-12; Grego, 724 F.2d at 704. We accordingly affirm St. Cyr's convictions.
 
 
 56
 Finally, Collier argues that the evidence was insufficient to support his conviction for possession of marijuana with intent to distribute, 21 U.S.C. Sec. 841(a)(1). The government offered evidence that on or about February 22, 1985, Collier and Casey Lyons knowingly drove a load of eight bales of marijuana, weighing approximately 440 pounds, from Florida to Minnesota, with the intent to deliver it to Cooke and other alleged conspirators. When officers searched the Maple Grove stash house on February 25, they found Collier, the marijuana, and the Lincoln used to transport it. A search of Collier's person revealed $1,000 which Cooke had paid him earlier that day for driving the marijuana from Florida. From this evidence the jury was entitled to infer that Collier was aware of the presence of contraband in the Lincoln and in the Maple Grove house, and that he exercised control over it, justifying a finding of constructive possession. Caspers, 736 F.2d at 1249. See also United States v. Jones, 676 F.2d 327, 332 (8th Cir.), cert. denied, 459 U.S. 832, 103 S.Ct. 71, 74 L.Ed.2d 71 (1982). We therefore affirm the conviction.
 
 VI.
 
 57
 All of the appellants challenge the propriety of Assistant U.S. Attorney Richard E. Vosepka's closing argument, and contend that the district court erred in denying their motions for mistrial. In this circuit, the grant or denial of a motion for mistrial lies within the discretion of the district court and may only be reversed on a showing of abuse of discretion. United States v. Andrade, 788 F.2d 521, 531 (8th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 462, 93 L.Ed.2d 408 (1986). When reviewing an allegation of prosecutorial misconduct, we consider whether the remarks were in fact improper and, if so, whether they prejudicially affected the defendants' substantial rights so as to deprive them of a fair trial. Id. at 530.
 
 
 58
 The appellants argue that the district attorney made an inflammatory attack on the integrity of counsel for O'Connell, Cooke and Collier, branding them as unethical. Collier, joined in part by Patterson and St. Cyr, argues that the district attorney labeled the appellants as dangerous people, referred to matters outside the record, expressed a personal opinion of guilt, and argued that he had told government witnesses "we wanted the truth." O'Connell contends with some force that the greater portion of the district attorney's argument dealt with such subjects. We are deeply troubled by the argument in this case. It involves a situation quite similar to that in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), where the Supreme Court warned against counsel being permitted "to make unfounded and inflammatory attacks on the opposing advocate." Id. 105 S.Ct. at 1043-44. We do not deal with a single statement of counsel as in Andrade, 788 F.2d at 531, but rather a studied pattern running through the arguments. As characterized by Justice Brennan in his dissent in Young, the "trial [was] something like a schoolyard brawl [among] children." Young, 105 S.Ct. at 1052 n. 4.
 
 
 59
 Two areas of argument may be dealt with quickly. While Collier argues that the prosecutor expressed his personal view that the defendants were guilty, the statement is at best ambiguous.[11] The district court was in a superior position to determine whether the statement expressed a personal view of guilt, but no objection was made by any of the defendants. The statement does not rise to the level of plain error, and we decline to consider it further. See Young, 105 S.Ct. at 1046-47. The district attorney also referred to the defendants as "dangerous people" in what we consider an emotional appeal.[12] However, the argument was based on the use of weapons in the drug trade and reiterated the opening statement of Collier's attorney regarding the pleading and testifying co-defendants.[13] An objection to this argument was sustained, and no further relief was sought. Viewed in context, we are not convinced that the argument was improper, but if any error resulted it was harmless beyond a reasonable doubt. See Lee, 743 F.2d at 1253-54.
 
 
 60
 Several of the district attorney's remarks, however, were clearly improper. Mr. Vosepka made personal attacks on defense counsel, charging them with improper motives and unethical conduct.[14] Young, 105 S.Ct. at 1044. He stressed his statements to government witnesses concerning, and his desire for, the truth.[15] Young, 105 S.Ct. at 1048; United States v. Peyro, 786 F.2d 826, 831 n. 5 (8th Cir.1986). He mentioned facts within his personal knowledge which were not contained in the record, and commented on O'Connell, Cooke and Collier's failure to produce certain evidence.[16] Young, 105 S.Ct. at 1048; Boyce, 797 F.2d at 694. Comments of this nature have no place in a criminal trial; the prosecutor's special duty as a government agent is not to convict, but to secure justice. Peyro, 786 F.2d at 831.
 
 
 61
 When prosecutorial misconduct occurs, several factors aid us in assessing its prejudicial impact, including the cumulative effect of the misconduct, the curative actions taken by the trial court, and the strength of the properly admitted evidence. Boyce, 797 F.2d at 694; Andrade, 788 F.2d at 530-31. We evaluate prosecutorial misconduct "in the context of the entire trial," Boyce, 797 F.2d at 694 (quoting United States v. Dawkins, 562 F.2d 567, 568 (8th Cir.1977) (per curiam)), and defense counsel's conduct, as well as that of the prosecutor, is relevant, Young, 105 S.Ct. at 1045. If defense counsel's argument "clearly invited the reply," Lawn v. United States, 355 U.S. 339, 359-60 n. 15, 78 S.Ct. 311, 323 n. 15, 2 L.Ed.2d 321 (1958), and the prosecutor "did no more than respond substantially in order to 'right the scale,' " Young, 105 S.Ct. at 1045, reversal is not warranted. See also Lee, 743 F.2d at 1253. The issue is not, of course, the prosecutor's license to make improper comments, but whether the errors were of such magnitude as to justify the reversal of otherwise valid convictions. Where proper objection is made, we apply the harmless error rule, Fed.R.Crim.P. 52(a), reversing only if the improper remarks could reasonably have affected the jury's verdict. Peyro, 786 F.2d at 831; Lee, 743 F.2d at 1254. See also Young, 105 S.Ct. at 1045 n. 10; United States v. Hasting, 461 U.S. 499, 510-11, 103 S.Ct. 1974, 1981-82, 76 L.Ed.2d 96 (1983). Absent an objection, we must determine whether the prosecutor's remarks were "such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice," Young, 105 S.Ct. at 1047; see also id. at 1049, warranting judicial review under the plain error rule, Fed.R.Crim.P. 52(b). The present case requires us to apply both standards.
 
 
 62
 Having carefully reviewed the record, we cannot say that the district attorney's remarks were so prejudicial as to deprive Patterson and St. Cyr of a fair trial. The prosecutor's improper comments and criticisms were directed solely to the closing arguments of counsel for O'Connell, Cooke and Collier;[17] indeed, he complimented Mr. Peterson, Patterson's attorney, on his closing argument.[18] Insofar as the prosecutor's improper comments may have had some indirect or "spillover" effect on St. Cyr and Patterson, any harm done was fully outweighed by the properly admitted evidence, which provided ample and convincing proof of their guilt. See supra Part V. The district court therefore did not abuse its discretion in denying Patterson and St. Cyr's motions for mistrial.
 
 
 63
 Our review also convinces us that the district attorney's remarks about counsel for O'Connell, Cooke and Collier were provoked by, and responsive to, their closing arguments. Young, 105 S.Ct. at 1045; Lawn, 355 U.S. at 359-360 n. 15, 78 S.Ct. at 323 n. 15. All three of the defense attorneys alleged that the prosecutor's motives and conduct were improper.[19] Mr. Birrell, Cooke's attorney, referred to matters not included in the record, and some of his comments improperly appealed to the jury's emotions, directing attention away from the evidence presented.[20] With respect to the district attorney's expressed desire for the truth, see supra n. 15, much of defense counsel's examination of the pleading and testifying co-defendants, particularly Sjolund and Timothy and Casey Lyons, went to their credibility, and their closing arguments were geared to this testimony and attacked the prosecutor on this very basis. While we cannot condone the district attorney's argument, we conclude that it was made in response to the arguments of counsel for these three appellants. In addition, the district court made a substantial effort to cure any harmful effect which the prosecutor's remarks may have had. It sustained objections to several comments, struck three others, explained the nature and function of closing arguments, and upheld the integrity of defense counsel before the jury.[21]
 
 
 64
 We have studied these arguments in light of the entire record. Weighed against the strength of the properly admitted evidence, the final factor we must consider, e.g., Boyce, 797 F.2d at 694, we cannot conclude that the district attorney's arguments warrant reversal. The evidence offered against Cooke and Collier, particularly the testimony of their co-defendants, was overwhelming in its volume and strength. For that reason, the prosecutor's improper remarks, taken in context, could not have seriously affected the fairness of the trial, Young, 105 S.Ct. at 1049, nor could they reasonably have affected the jury's verdict, Lee, 743 F.2d at 1254. The district court therefore did not abuse its discretion in denying Cooke and Collier's motions for mistrial.
 
 
 65
 O'Connell's defense was aimed primarily at the credibility of Timothy and Casey Lyons and Steve Sjolund. Their history of drug use was examined, particularly that of Casey Lyons. The fact that all had agreed with the government to give truthful testimony was an issue of examination, as was the fact that the district attorney, Mr. Vosepka, would make the final decision as to whether they had given truthful testimony. It was developed that the witnesses owned houses they hoped the government would allow them to retain, which O'Connell's counsel suggested were purchased with drug profits. The cross-examination of these witnesses was vigorous. Mr. Ross's argument with respect to their truthfulness, and the motivation and integrity of the district attorney, was based on this evidence and provoked Mr. Vosepka's response.
 
 
 66
 The evidence against O'Connell was less extensive than that against the other parties, but it was strong and convincing. We have discussed above the evidence of the telephone calls between Cooke in the Minneapolis area and O'Connell in Florida, and the increased volume of the calls before and after trips between the two areas. See supra Part V. Telephone company records show a continued volume of calls to O'Connell's warehouse, whether it was leased in his name, that of his predecessor, Ed Smith (there was vigorously contested testimony that Smith's signature on the lease was that of O'Connell), or one of O'Connell's related companies. The role of Berta Rodon as a contact between Florida and Minneapolis was particularly incriminating. In one of the calls found on the recorder in O'Connell's office, O'Connell discussed the four Lincoln Continentals with Rodon. She told him that she had left Miami with the keys for one of them, and O'Connell related that he had sent someone to the airport with a key that did not match either of the beige ones or the blue one, and he was hoping it would fit the gold one. Rodon's presence in Minneapolis was established by independent testimony. She was involved in a collision while riding in a Lincoln driven by Greg Cooke and gave a false name to the investigating police officer. There was testimony of an exchange of briefcases between Rodon and another person and Greg Cooke and Timothy Lyons at a Howard Johnson's Restaurant in St. Paul, and telephone records established a telephone call shortly afterwards between Rodon and O'Connell before Rodon caught a plane to Miami. There was testimony that Rodon would not go to the stash house herself, but would leave her car at the motel and someone else would take it to the house. The last trip of the Lincoln from Florida to Minnesota, and the result of the searches in both locations, was particularly telling.
 
 
 67
 In light of the entire record, considered under the principles which focus our review, we cannot conclude that the prosecutor's argument could reasonably have affected the jury's verdict, Lee, 743 F.2d at 1254,[22] or that the district attorney's remarks seriously affected the fairness of the trial, Young, 105 S.Ct. at 1049. The district court therefore did not abuse its discretion in denying O'Connell's motion for mistrial.
 
 
 68
 "[R]eviewing courts ought not to be put in the position of weighing which of two inappropriate arguments was the lesser." Young, 105 S.Ct. at 1045. Lest our criticism of counsel simply fall into the pages of books seldom opened, and in view of concerns we have previously expressed, see Peyro, 786 F.2d at 832, we direct that upon issuance of the mandate in this case the district court conduct such inquiry as it deems appropriate to determine whether sanctions should be imposed upon counsel for any of the parties. See District of Minnesota Rule 1F. See also Hasting, 461 U.S. at 506 & n. 5, 103 S.Ct. at 1979 & n. 5. The district court is in a superior position to assess the conduct of counsel in the context of the trial and to determine whether disciplinary action is appropriate.
 
 VII.
 
 69
 Defendants Collier, Patterson and St. Cyr contend that they were entitled to individual trials, separate from all of their co-defendants. They argue that the district court erred in joining their trials to the others and in denying their motions for severance.
 
 
 70
 Joinder of two or more defendants is proper "if they are alleged to have participated * * * in the same series of acts or transactions constituting an offense or offenses." Fed.R.Crim.P. 8(b). Rule 8(b) has been interpreted to require some common activity involving all the defendants which embraces all the charged offenses, but it is not necessary that every defendant have participated in or be charged with each offense. United States v. Bledsoe, 674 F.2d 647, 656 (8th Cir.), cert. denied, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982). The prerequisites for joinder under Rule 8(b) are liberally construed, id., at 655, and persons charged with involvement in a single conspiracy should ordinarily be tried together. United States v. Rochon, 575 F.2d 191, 197 (8th Cir.), cert. denied, 439 U.S. 979, 99 S.Ct. 564, 58 L.Ed.2d 650 (1978). Generally the propriety of a joinder must appear on the face of the indictment. United States v. Sanders, 563 F.2d 379, 382 (8th Cir.1977), cert. denied, 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 767 (1978).
 
 
 71
 Each of the defendants was named in a single marijuana conspiracy count, and all of the other charges against Collier, Patterson and St. Cyr were closely related to the operation of the conspiracy. These were sufficient allegations that the defendants participated "in the same series of acts or transactions constituting an offense or offenses" to render the joinder proper. Fed.R.Crim.P. 8(b). See United States v. Jackson, 696 F.2d 578, 585 n. 2 (8th Cir.1982), cert. denied, 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983); Sanders, 563 F.2d at 382-83.
 
 
 72
 The three defendants argue, however, that inclusion of the CCE charges against Cooke and O'Connell and of the tax count against Cooke renders the joinder improper. Proof of the CCE charges required evidence that Cooke and O'Connell had conspired with others to distribute marijuana and that they obtained substantial income from their drug activity. 21 U.S.C. Sec. 848(d)(2). Proof of the tax count, as charged in the indictment, also required evidence of income from the sale of illegal drugs. If the indictment invites joint proof, as here, the prima facie validity of joinder is shown. Haggard v. United States, 369 F.2d 968, 974 (8th Cir.1966), cert. denied, 386 U.S. 1023, 87 S.Ct. 1379, 18 L.Ed.2d 461 (1967). Further, it is clear under our precedents that joinder of the CCE charges in these circumstances was entirely proper. E.g., United States v. Lueth, 807 F.2d 719, 730 (8th Cir.1986). We believe joinder of the tax count was also proper, and are satisfied that if any error occurred, it was harmless. Id. at 730 & n. 6 (citing United States v. Lane, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986)). We accordingly reject the misjoinder claims.
 
 
 73
 Collier, Patterson and St. Cyr argue in the alternative that they were entitled to severance under Fed.R.Crim.P. 14, even if their joinder were technically proper. A motion to sever rests within the district court's discretion, and we will not reverse its decision absent a showing of clear prejudice which indicates an abuse of discretion. Garcia, 785 F.2d at 220. To show such prejudice, a defendant must establish something more than the mere fact that his chances for acquittal would have been better had he been tried separately. He must affirmatively demonstrate that the joint trial prejudiced his right to a fair trial. United States v. Jackson, 549 F.2d 517, 524 (8th Cir.), cert. denied, 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977).
 
 
 74
 Collier, Patterson and St. Cyr claim that the joint trial was prejudical because the bulk of the evidence was relevant only to the charges against Cooke and O'Connell, the parties offered inconsistent defenses, and the trial was so complex that the jury could not compartmentalize the evidence, creating a danger of conviction by spillover effect. However, the preference for joint trials of defendants jointly indicted, particularly where conspiracy is charged, is not limited by any requirement that the evidence of each defendant's culpability be quantitatively or qualitatively equivalent. Jackson, 549 F.2d at 525. Nor are inconsistent defenses a ground for severance. See, e.g., United States v. Hutul, 416 F.2d 607, 620 (7th Cir.1969), cert. denied, 396 U.S. 1012, 90 S.Ct. 573, 24 L.Ed.2d 504, reh'g denied, 397 U.S. 1081, 90 S.Ct. 1519, 25 L.Ed.2d 820 (1970). Finally, the roles of the defendants in the drug conspiracy were sufficiently distinct that the jury, aided by the court's instructions, could compartmentalize the evidence against each. Andrade, 788 F.2d at 530. Cooke and O'Connell were charged and frequently distinguished as the kingpins of the operation, while Collier, Patterson and St. Cyr carried out orders and closed the deals which actually generated income for the operation. In addition, the jury acquitted Cooke of one count of using a telephone to facilitate marijuana distribution, and "[w]e have characterized this result before as 'convincing evidence that the jury was able to separate proof as to each defendant.' " Lueth, 807 F.2d at 731 (quoting United States v. Reed, 658 F.2d 624, 630 (8th Cir.1981), cert. denied, 455 U.S. 1002, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982)). For these reasons, we are satisfied that the district court did not abuse its discretion in determining that Collier, Patterson and St. Cyr would not be prejudiced by a joint trial, and that it properly denied their motions for severance. Fed.R.Crim.P. 14.
 
 VIII.
 
 75
 Having considered all of the issues raised by the defendants on this appeal, we affirm the judgments of conviction entered by the district court.
 
 
 
 *
 The HONORABLE THOMAS E. FAIRCHILD, Senior Circuit Judge for the United States Court of Appeals for the Seventh Circuit, sitting by designation
 
 
 [1]
 Each of the defendants was convicted of conspiracy to distribute marijuana. 21 U.S.C. Secs. 841(a)(1), 846 (1982). In addition, Cooke was convicted of engaging in a continuing criminal enterprise (CCE), 21 U.S.C. Sec. 848 (1982), of filing a false income tax return, 26 U.S.C. Sec. 7206(1) (1982), and of using interstate travel to aid racketeering, 18 U.S.C. Sec. 1952(a)(2), (3) (1982). Cooke, O'Connell, Patterson and Collier were convicted of possession with intent to distribute marijuana, 18 U.S.C. Sec. 2 (1982); 21 U.S.C. Sec. 841(a)(1), and Cooke, Patterson, Collier and St. Cyr were convicted of using telephones to facilitate drug distribution, 21 U.S.C. Sec. 843(b) (1982)
 
 
 [2]
 The Honorable Robert G. Renner, United States District Judge for the District of Minnesota
 
 
 [3]
 Charles O'Brien distributed marijuana for Timothy Lyons in Minnesota. He pled guilty to one count of conspiracy to distribute marijuana and testified on behalf of the government at trial
 
 
 [4]
 O'Connell was not charged with possession of the marijuana seized in Florida
 
 
 [5]
 Section 2518(5) provides in relevant part: "Every order * * * shall contain a provision that the authorization to intercept * * * shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter."
 
 
 [6]
 We also reject Patterson's related argument that the district court erred in denying the defendants' joint motion for disclosure and production of government informants. Patterson has failed to demonstrate that any evidence the informants may have provided would have been material to his defense or that of the other defendants, United States v. Grisham, 748 F.2d 460, 462-64 (8th Cir.1984), nor has he made a substantial showing that false statements were intentionally or recklessly included in the government's wiretap affidavits, or satisfactorily explained his failure to make such a showing, Franks v. Delaware, 438 U.S. 154, 155-56, 171-72, 98 S.Ct. 2674, 2684-85, 57 L.Ed.2d 667 (1978); Garcia, 785 F.2d at 222
 
 
 [7]
 See, e.g., Johnson, 767 F.2d at 1271 (body microphone on government informant); United States v. Panas, 738 F.2d 278, 281 (8th Cir.1984) (same); United States v. McCowan, 706 F.2d 863, 864-65 (8th Cir.1983) (per curiam) (body microphone on state police investigator); United States v. Gordon, 688 F.2d 42, 43-44 (8th Cir.1982) (recorder attached to telephone and recorder on person of government informant); Durns v. United States, 562 F.2d 542, 547 (8th Cir.), cert. denied, 434 U.S. 959, 98 S.Ct. 490, 54 L.Ed.2d 319 (1977) (recording device placed on telephone); McMillan, 508 F.2d at 103 (same); but cf. Risken, 788 F.2d at 1369-70 (recordings made by informant without government assistance)
 
 
 [8]
 We also reject O'Connell's claim that the government "intercepted" the tape in violation of 18 U.S.C. Sec. 2511(1). Even if we assume, arguendo, that Sec. 2511(1) does apply to the government's seizure of a privately-recorded tape, see United States v. Vest, 813 F.2d 477, 481 (1st Cir.1987), we believe the evidence was sufficient to sustain a finding that the conversations were recorded by O'Connell, a party to most of them, or with the consent of other parties to the conversations within the meaning of 18 U.S.C. Sec. 2511(2)(d). In addition to the evidence summarized above, conversations on the O'Connell audiotape contain statements by Cooke, O'Connell, and Timothy Lyons from which the district court could infer that the speakers were aware the calls were being recorded. For example, in one call, made by Cooke from O'Connell's warehouse to Timothy Lyons at a nearby Ramada Inn, Cooke repeatedly interrupts Lyons, saying: "Remember where we're at now, right? * * * Hey, hey. Do you remember what we're doing now? * * * Let's talk when we gets to talk." (Blue 19). With this evidence the district court could conclude that the recording was not unlawful, and suppression of the tape was not required. See 18 U.S.C. Secs. 2511(1)(c), 2515
 
 
 [9]
 We reject Cooke's related arguments that he was entitled to an instruction that he could be convicted on the CCE count as an aider and abettor only, and that the district court abused its discretion in sentencing him, a first-time marijuana offender, to twenty five years of imprisonment without parole
 We have no difficulty concluding that the record contained sufficient evidence to support an aiding and abetting instruction, cf. United States v. Hudson, 717 F.2d 1211, 1214-15 (8th Cir.1983) (evidence supported instruction for aiding and abetting manufacture and possession of marijuana), assuming arguendo that such an instruction may be given on a CCE charge, cf. United States v. Ambrose, 740 F.2d 505, 507 (7th Cir.1984) (implicitly finding giving of instruction proper), cert. denied, 472 U.S. 1017, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985). But our conclusion that the evidence was sufficient to sustain Cooke's CCE conviction necessarily implies that the evidence also supported a CCE instruction. Cf. id. at 507 (finding no evidence supporting CCE charge against defendants). In that sense, Cooke's requested instruction to the effect that he could be convicted only as an aider and abettor was not supported by evidence. Cf. United States v. Prieskorn, 658 F.2d 631, 636 (8th Cir.1981) (describing criteria for submission of requested defense instructions). Cooke opposed the giving of a conventional aiding and abetting instruction.
 The imposition of a sentence is a matter within the district court's wide discretion; generally we will not overturn or review a sentence which falls within statutory limits. Resnick, 745 F.2d at 1188. A defendant must present a clear and convincing case of abuse or a patent violation of a constitutional guarantee. Garcia, 785 F.2d at 228. Cooke's sentence is well within that authorized for first-time offenders, 21 U.S.C. Sec. 848(a); the court's denial of parole was mandatory, 21 U.S.C. Sec. 848(e); and we have recently decided that the sentencing provisions of section 848 are consistent with the eighth amendment, United States v. Lewis, 759 F.2d 1316, 1333-35 (8th Cir.), cert. denied, 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985), and the due process clause of the fifth amendment, Becton, 751 F.2d at 257. Given the compelling evidence adduced at trial regarding the scope and duration of Cooke's drug activities, we find no abuse of discretion in the district court's sentencing decision.
 
 
 [10]
 We also reject Cooke's argument that the government's summary of its financial analysis, entitled "Unexplained Sources of Funds," was improperly admitted into evidence. Cooke claims that use of the word "unexplained" in the title shifted the burden of proof to him and was an improper comment on his failure to testify. However, the trial court carefully described the expenditure method of proof to the jury and informed them in both introductory and final instructions that the burden of proof rested solely on the government. We do not believe that use of the word "unexplained", viewed in context, shifted the burden of proof to Cooke. Cf. United States v. Schultz, 698 F.2d 365, 367 (8th Cir.1983) (prosecutor's comment on defendant's failure to call available alibi witness in extortion case does not shift burden of proof to defendant)
 For similar reasons, we do not believe the title of the summary either manifested the prosecutor's intent to call attention to Cooke's failure to testify, or was such that the jury would naturally take it as such a comment. United States v. Durant, 730 F.2d 1180, 1184 (8th Cir.), cert. denied, 469 U.S. 843, 105 S.Ct. 149, 83 L.Ed.2d 87 (1984). The court specifically instructed the jury that a defendant's failure to testify must not be considered or even discussed. In view of the record as a whole, the title of the summary cannot reasonably be considered an improper comment on Cooke's failure to testify. Id.
 
 
 [11]
 "I know how much proof it would take for me as a juror in this case or any other case to think I have reached the level of reasonable doubt. So if I over prove something * * * could it be because I don't know what it will take to reach the level of convincing the particular twelve of you in this particular case?" Tr. 2692-93
 
 
 [12]
 Mr. Vosepka stated: "We have shown you a significant number of weapons in this case. * * * Why do we put those weapons in? It relates to something that's involved in drug trafficking. Drug traffickers do that to protect themselves. * * * The defense in their cross-examination * * * took pains to point out that these were dangerous people. In fact, I think I recall Mr. Hawkins saying in opening statement in talking about the anticipated testimony of the testifying co-defendants, these aren't rascals. These are dangerous people. Well, ladies and gentlemen, these five defendants here aren't rascals. They're dangerous people. They're dangerous people engaged in drug trafficking." Tr. 2464-66 (objection sustained)
 
 
 [13]
 Tr. 93
 
 
 [14]
 "During this case, from the opening statement through the cross-examinations, through the closing argument, the lawyers for three of the defendants have attempted to prejudice you, not against the facts of the government's case, but against the government attorney personally and against the investigators
 "Now, with regard to the investigators, that's fair game * * *. But when it's done not regarding testimony but to suggest evil motives or dishonesty by government attorney or the agents in presenting the case, it is improper. Why is it improper? Because it is not considered fair or ethical to try to discredit an opposing party's case by trying to discredit their representative to the finder of fact, in this case the jury." Tr. 2657 (objection sustained, Tr. 2658).
 
 
 [15]
 "What did you see about the way the government handled witnesses? * * * How many times did I tell those co-defendant witnesses we wanted the truth? How many times did that come out in direct and cross-examination?
 "One of the defense counsel brought up that there was even a provision in the plea agreements about the defendant witnesses being subject to a lie detector test at the government's option. Now, you probably all know lie detector tests aren't admissible * * *. So why would I put that in there? It's one way, it's one tool, it's one mechanism to convince those people I really do want the truth." Tr. 2661 (objection sustained).
 
 
 [16]
 "Cooke didn't pay him that. Why? Because that didn't have a rubber band on it. There was another thousand dollars somewhere that wasn't put into evidence that did have a rubber band on it. So somehow that's supposed to prove to you--" Tr. 2691 (objection overruled)
 "Whatever happened to Mr. Raben's opening statement about how Mr. Pat O'Connell got lucky at the race track? I was waiting to see the evidence on that." Tr. 2670 (objection overruled).
 "I was waiting for that, because I was going to get up here and say at the end, well, maybe Dan O'Connell's dad goes to the same track that Pat Collier does and the same track that Greg Cooke does, when all these guys earned this money. I didn't get to do that." Tr. 2670.
 "Why would Dan O'Connell have to mess around with marijuana when he has got this gold mine? * * * Maybe you would want to buy a gold mine if you had 200,000 laying around. Where did he get that 200,000, the cash in the wall? Did that lady ever photograph any cash? Did he have one single eyewitness ever come on, either through stipulated testimony or in person, to tell you that they saw that cash?" Tr. 2674 (objection overruled).
 "Mr. Raben in his opening statement alluded to money found in the wall, money that people would later recall as having smelled musty, musty money, the old cash hoard in the wall. Was there one single bit of evidence--" Tr. 2677-78 (objection overruled).
 "Was there one single bit of evidence in this case from any witness, bank tellers, bank employees, anybody, that they remember some musty money?" Tr. 2678.
 
 
 [17]
 Tr. 2657-59
 
 
 [18]
 Tr. 2656
 
 
 [19]
 Mr. Ross, O'Connell's attorney, stated: "Well, Mr. Vosepka, in an effort to fairly present the evidence in this case, came into court and now asks you to believe what he said on the tape is true, notwithstanding the fact that his witness said it's a lie." Tr. 2484
 "[I]f I sound critical of the government and claim that they haven't fairly presented the evidence in this case, it's because they haven't." Tr. 2485.
 "You should know from having sat through almost five weeks of a trial that you can't put people on the witness stand and ask them their opinion of things, except experts * * *. Mr. Vosepka says 12 years he's been at his job. You'd think in 12 years perhaps that might have dawned on him. Perhaps not * * *." Tr. 2485-86.
 "They can't prove it. They knew they couldn't prove it. Tim Lyons said I can't help you prove it. But notwithstanding that, this is the type of question that the government put before you. It's unfair. It's unfair, because it painted a picture to you as if to say that this man had an opinion that O'Connell was the source. And that's not evidence. But that's what it was put there for. Now, I suggest that that's not a fair representation of the evidence in this case. And that wasn't the only occasion that that occurred." Tr. 2486-87 (objection overruled).
 "The government, when they had Tim Lyons on the witness stand, an interesting thing happened. Mr. Hawkins asked on cross-examination of Tim Lyons whether or not his plea agreement * * * required him to submit to a polygraph examination if the government asked for it. He said yes. Did the government ask? No. The government wasn't even concerned. The government didn't care." Tr. 2487 (objection sustained).
 Mr. Birrell, Cooke's attorney, stated: "I think that the government itself recognizes that its case is weak because they have done a lot of subtle and mischievous, and I say, wicked things--." Tr. 2589 (objection sustained). "To influence you." Id. (objection sustained). "I want you to understand that I'm not trying to improperly argue the case. But I do want to talk to you about some of the things that have been done by the government." Id. (objection sustained). "The reason the guns were brought in was to poison your mind." Tr. 2590 (objection sustained).
 "Why does the government produce the testimony of these people, these nine paragons of virtue, who are supposed to come in and tell you what is supposed to be the truth, when the agent who debriefed them, Fisher, tells you some of them are truthful and some of them are not? Is the government willingly and knowingly putting false testimony in front of you? Is that fair?" Tr. 2591.
 For Mr. Hawkins' statements, see Tr. 2544-45, 2561, 2565-66.
 
 
 [20]
 Mr. Birrell said: "What's the next built-in bias? They're all making a deal for money. Now, if I told you that somebody paid a witness a hundred bucks to testify, you wouldn't believe a word they said. * * * They're * * * paying them with money. Here's how. Sjolund has got a house that he bought, they're going to let him keep. Timothy Lyons--" Tr. 2595 (objection sustained)
 "[T]his case is a story about evil. * * * And the reason that you must understand evil is that you must understand that in this case, the government, your government, is asking you to shake hands with the devil." Tr. 2586.
 "And incidentally, all these people have a built-in motive to want to get Mr. Cooke. These are the fellows that said, 'I am going to take Cooke's kids and kill them. That will ruin him.' Or, 'If Cooke comes over to your door, just shoot him. Kill him.' These are the kind of guys they made the deal with. These are the devils that you are supposed to shake hands with and indeed embrace and believe." Tr. 2596.
 "The government's theory is based on a couple things: The snitches, suspicion, innuendo, association. I'm telling you folks that these people, Lyonses and Sjolund, are just plain evil. And if you want to embrace them, if you want to say beyond a reasonable doubt I would not hesitate to act on what they've got to say, then go ahead. But if you do, I fear for the rule of law in this country." Tr. 2603.
 In addition, Mr. Hawkins said: "Now, ladies and gentlemen, anybody who would render a verdict in the supposed accord with the United States government violates their oath." Tr. 2546 (objection sustained).
 
 
 [21]
 Many of the court's rulings have been set out in the margin. See supra notes 12, 14-17. The court told the jury: "Members of the jury, you have heard certain objections being made. You've heard the Court sustain some and reject some. * * * [C]losing arguments * * * [are] not evidence. They are the parties' interpretation of the evidence in the best light of their client. That's their job. Argument is supposed to be hard hitting, and it's supposed to be fair
 "And from time to time, attorneys might stray a little, but I can tell you that these attorneys, and all of them, are honorable people." Tr. 2664-65.
 
 
 [22]
 What we have said about the arguments makes abundantly clear that if there was any error it was harmless beyond a reasonable doubt. See Hasting, 461 U.S. at 510-11, 103 S.Ct. at 1981-82